UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles Ira BLACK,
Defendant-Appellant.

No. 84–3074.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 7, 1985.

Decided Aug. 7, 1985.

Robert C. Weaver, Asst. U.S. Atty., Portland, Or., for plaintiff-appellee.

Norman Sepenuk, James Collins, Portland, Or., for defendant-appellant.

Before KILKENNY, WALLACE, and SNEED, Circuit Judges.

SNEED, Circuit Judge:

Black appeals his convictions for 19 counts of mail fraud, in violation of 18 U.S.C. § 1341; 16 counts of aiding and abetting the preparation of false income tax returns, in violation of 26 U.S.C. § 7206(2); one count of failing to file a tax return, and one count of filing a return which materially understated gross receipts, in violation of 26 U.S.C. § 7206(1). Black contends that the trial judge erred in refusing to order corrective action in response to a letter sent by the prosecutor to prospective witnesses and in admitting certain evidence at trial. Black also challenges the award of restitution fixed as a condition of his probation. We affirm Black's conviction, but reverse the restitution order.

I.

BACKGROUND FACTS AND ISSUES

The evidence at trial established that Black sold tax shelters involving commodity straddles in treasury bill (T-Bill) and

silver futures. Black represented to investors that Oxford Investment Management Company (Oxford), an independent commodity brokerage house located in the Cayman Islands, would actually conduct the straddle transactions. There was evidence that Oxford never made the promised futures transactions. Instead, Black diverted funds invested in Oxford to his own use and benefit. He manufactured the confirmation slips and other records documenting the purported transactions at his office in Portland, Oregon.

Black was convicted after a jury trial. The district judge sentenced Black to a combined total of 8 years imprisonment based on one mail fraud and one false tax return count. The district judge also imposed fines totalling $114,000 and costs of prosecution in the amount of $28,291.91. As a condition of probation on the remaining counts, the judge ordered Black to make restitution in an amount not to exceed $787,000.[1]

On appeal, Black does not attack the sufficiency of the evidence underlying the convictions. Rather, he alleges that the district court erred in the following four respects. These are: (1) that the district court erred in failing to order the prosecutor to send a "corrective letter" informing prospective witnesses that they had no obligation to speak with either defense or prosecution attorneys; (2) that the district court should have suppressed evidence obtained from Ms. Grace George; (3) that the district court should not have admitted certain documents pertaining to Oxford and the testimony relating to them; and (4) that the district court erred in ordering restitution in an amount in excess of the specific dollar amounts alleged in the indictment. As indicated above, we find merit only in the last contention. We shall discuss each separately, however.

## II.

### THE CORRECTIVE LETTER ISSUE

In preparing the government's case for trial, the prosecutor sent a letter to all prospective witnesses. Enclosed with the letter was a subpoena. The letter explained the pretrial and trial procedures and went on to say,

> At some point prior to trial you may be contacted by an attorney on behalf of the defendant. You may speak to this person if you choose, but have no obligation to do so.

Black objected that the letter discouraged witnesses from talking to the defense. He requested that the district court order the prosecutor to send a corrective letter, clarifying that the witnesses had no obligation to speak with either defense or prosecution attorneys. Despite statements by defense counsel that prospective witnesses were refusing interviews, the district judge concluded that Black had failed to present "evidence of any substantial weight of any witness who had refused to speak with defense counsel *because of receipt of the government's letter.*" Excerpt at 55. Consequently, the district court denied Black's request for corrective action.

Black contends that the district court erred by conditioning corrective action on a showing that witnesses refused to talk to the defense because of the letter. It is true, as Black contends, that both sides have the right to interview witnesses before trial. *See United States v. Cook,* 608 F.2d 1175, 1180 (9th Cir.1979), *cert. denied,* 444 U.S. 1034, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980). Absent a fairly compelling justification, the government may not interfere with defense access to witnesses. *Id.; accord United States v. Scott,* 518 F.2d 261, 268 (6th Cir.1975). Black relies primarily on *Gregory v. United States,* 369 F.2d 185 (D.C.Cir.1966), *cert. denied,* 396 U.S. 865, 90 S.Ct. 143, 24 L.Ed.2d 119 (1969). In *Gregory,* the prosecutor advised the witnesses not to talk to anyone *unless he was present.* The court held that such advice effectively denied de-

---

1. The district court published an opinion explaining, inter alia, its decisions to impose costs and order restitution. *See United States v. Black,* 589 F.Supp. 594 (D.Or.1984).

fense counsel access to witnesses except in the presence of the prosecutor, and consequently denied the defendant a fair trial. Black contends that the prosecution in the present case similarly impaired Black's ability to prepare for trial.

■ Black's reliance on *Gregory* is misplaced. In the present case, the prosecutor did not insist on being present at the defense interviews; rather, he merely advised the witnesses of their right to decline the defendant's request for an interview. Unlike the advice given in *Gregory*, the prosecutor's letter constituted a correct statement of the law and was not improper.[2]

■ Black ignores that a defendant's right of access to a witness "exists co-equally with the witnesses' right to refuse to say anything." *United States v. Rice*, 550 F.2d 1364, 1374 (5th Cir.), *cert. denied*, 434 U.S. 954, 98 S.Ct. 479, 54 L.Ed.2d 312 (1977); *accord Scott*, 518 F.2d at 268. The defendant's right of access is not violated when a witness chooses voluntarily not to be interviewed. *See, e.g., United States v. Pinto*, 755 F.2d 150, 152 (10th Cir.1985); *United States v. Bittner*, 728 F.2d 1038, 1041 (8th Cir.1984). While the prosecution may not interfere with a witness's free choice to speak with the defense, we agree with courts in other circuits that merely informing the witness that he may decline the interview is not improper. *See, e.g., Pinto*, 755 F.2d at 152; *Bittner*, 728 F.2d at 1041–42; *United States v. White*, 454 F.2d 435, 439 (7th Cir.1971), *cert. denied*, 406 U.S. 962, 92 S.Ct. 2070, 32 L.Ed.2d 350 (1972). The district court properly refused Black's request for corrective action.

## III.

### THE GRACE GEORGE DOCUMENTS ISSUE

In September 1979, state and federal agents obtained various documents from Ms. Grace George, who had served as Black's personal assistant from October 1976 until September 1978. George maintained business records relating to Oxford. She stored many of these records at her apartment, for which Black paid the rent. Black maintains that he instructed George to keep these documents hidden and that he did not authorize George to disclose the records to others.

In September 1978, Black terminated George's employment. George removed various Oxford documents from her desk and took them to her apartment as well. Black and George continued a relationship after George's employment was terminated. George continued to store Oxford documents at her apartment, and Black continued to pay her rent.

In early September 1979, an agent of the Oregon Corporation Commission contacted George in the course of investigating Black. They arranged a luncheon meeting, which an IRS agent, Andrew Karamanos, also attended. At the meeting, George produced one or two documents. Karamanos and another IRS agent met George again the following day. George invited them to her apartment, where she turned over 310 Oxford documents, of which the government introduced roughly 100 at Black's trial.

Prior to trial, Black, claiming an unlawful seizure, moved to suppress the evidence that the IRS obtained from George. Find-

**2.** Two Ninth Circuit cases have considered and rejected arguments similar to Black's. In *United States v. Rich*, 580 F.2d 929 (9th Cir.), *cert. denied*, 439 U.S. 935, 99 S.Ct. 330, 58 L.Ed.2d 331 (1978), an FBI agent advised witnesses that they need not confer with the defense counsel. *Id.* at 933. Although the panel warned that informing witnesses of their right to refuse an interview may lead to abuses, it concluded that the situation before it did not amount to a denial of access to potential witnesses. *Id.* at 934. And in *United States v. Mirenda*, 443 F.2d

1351 (9th Cir.), *cert. denied*, 404 U.S. 966, 92 S.Ct. 343, 30 L.Ed.2d 286 (1971), the prosecutor, acting on instructions from the district judge, introduced the defense attorney to the government's confidential informer by telling the informer that the decision to submit to an interview was entirely his. *Id.* at 1355 n. 3. The informer refused an interview. The panel, distinguishing the situation in *Gregory*, found no error in either the trial court's instruction or the prosecutor's conduct. *Id.* at 1356.

ing no Fourth Amendment violation, the district judge denied Black's motion. Black charges error in the failure of the district judge to suppress this evidence. We disagree.

 A wrongful search or seizure conducted by a private person does not violate the Fourth Amendment. *United States v. Walther*, 652 F.2d 788, 791 (9th Cir.1981). However, if that individual acts as an instrument or agent of the state in conducting the search or seizure, a Fourth Amendment violation may occur. *Coolidge v. New Hampshire*, 403 U.S. 443, 487–90, 91 S.Ct. 2022, 2048–50, 29 L.Ed.2d 564 (1971); *United States v. Miller*, 688 F.2d 652, 656 (9th Cir.1982). The critical factors are "(1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends." *Id.* at 567; *accord United States v. Snowadzki*, 723 F.2d 1427, 1429 (9th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 140, 83 L.Ed.2d 80 (1984). Because Karamanos obviously knew of or acquiesced in George's conduct when she surrendered the Oxford documents, we must assess George's intent at the time she made the transfer.

The district court found that the government did not instigate George's willingness to turn over the Oxford records. In particular, the court found that George's actions resulted from personal motives and not from the government's offer of a reward or of immunity. *See* Excerpt at 86–88. Black attacks this conclusion as clearly erroneous. He alleges that the government agents, in contacting George in the course of their investigation, induced George to turn over the documents. Such influence, he argues, necessitates a finding that George acted as a government agent.

 Admittedly, this is not a case in which the the private individual who undertook the search initiated the contact with

the government. *See, e.g., Snowadzki*, 723 F.2d at 1428–30; *United States v. Sherwin*, 539 F.2d 1, 6–8 (9th Cir.1976). But the fact that the government contacted George, rather than the other way around, does not alone preclude a finding that George cooperated voluntarily. *See United States v. Veatch*, 674 F.2d 1217, 1221–22 (9th Cir.1981) (as modified), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2013, 72 L.Ed.2d 469 (1982). The testimony indicates that George did not reveal her possession of Oxford documents to the government until she spontaneously and voluntarily surrendered a few Oxford documents at the luncheon meeting with Karamanos. *See* 9 Reporter's Transcript [hereinafter cited as R.T.] at 77–78, 80; 12 R.T. at 458. Karamanos then asked if George had more documents, and George indicated that she did. 9 R.T. at 59; 12 R.T. at 459. Although both Karamanos and George testified that they discussed the possibility that the government would offer George a reward or grant her immunity in exchange for her assistance in its investigation of Black, their testimony differed as to whether this discussion occurred before or after George surrendered the documents stored in her apartment.[3] But both testified that Karamanos made no promise of a cash reward or of immunity at any time. *See* 9 R.T. at 61–62, 84–85; 20 R.T. at 1701–02.

 At most, the evidence suggests the possibility that the government induced George's desire to cooperate. This is not enough, however. While George may have felt under some pressure to cooperate with Karamanos merely because he was a government agent, this alone does not render George's behavior involuntary. *See Coolidge*, 403 U.S. at 487–88, 91 S.Ct. at 2048–49; *Sherwin*, 539 F.2d at 8; *see also Veatch*, 674 F.2d at 1221 (merely wishing to aid the government, standing alone, does not suffice to convert a private actor into a government agent). The district court,

---

3. *Compare* 9 R.T. at 62 *and* 12 R.T. at 427 (George's testimony that the subject of a reward came up after she gave Black's records to Karamanos) *with* 20 R.T. at 1699 (Karamanos's testimony that the subject came up before George agreed to turn over the documents) *and* Excerpt at 71–72 (Karamanos's memorandum summarizing the luncheon meeting).

even if reviewed de novo, did not err in finding that George's decision to turn over the Oxford documents to the government was not coerced. Her decision was to advance her interests. Therefore, no violation of the Fourth Amendment required suppression of those records at trial.[4]

## IV.

### THE OXFORD DOCUMENTS ISSUE

Prior to trial, the government moved under Fed.R.Crim.P. 17(c) to require Black to produce various documents and records relating to Oxford. Black opposed the government's motion on the ground that production would violate his Fifth Amendment rights. The district court inspected the requested papers in camera and sustained Black's objection to production. At trial, the government renewed its motion to require Black to produce any Oxford documents in his possession. This time the district court granted the government's request.

Among the records produced were confirmation slips which purported to reflect transactions in T-Bill and silver futures made by London Atlantic Market Brokers, Ltd., a commodities dealer. Oxford had sent photocopies of these confirmation slips to certain investors who requested additional documentation of the Oxford transactions. The government introduced the originals at trial. The defense unsuccessfully objected that the slips were not properly authenticated. During the government's cross-examination, Black denied that he had prepared the London Atlantic slips himself and disclaimed any knowledge

of whether the slips were forgeries. Black maintained that he disassociated himself from Oxford in 1982. He testified that he had obtained the slips at the request of his attorney while visiting the Cayman Islands.

Following the conclusion of Black's testimony, the government showed the confirmation slips to its rebuttal witness, David Lamb. Lamb was the owner and chairman of the London & Atlantic Market Brokers.[5] Lamb testified that the purported confirmation slips were false and that London & Atlantic did not deal in T-Bill futures.

Black moved to strike the Oxford documents and the testimony relating to them, apparently renewing his Fifth Amendment contention. The district court denied Black's motion. Black contends on appeal that the compelled production of the documents violated his privilege against self-incrimination and that the district court allowed the slips into evidence without proper authentication, as required by Fed. R.Evid. 901.

### A. *Self-Incrimination*

▆▆▆ Ordinarily, the self-incrimination privilege does not protect business records. *E.g., Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). The act of producing such records, however, may be sufficiently testimonial to be privileged. *See United States v. Doe,* 465 U.S. 605, 104 S.Ct. 1237, 1242–43, 79 L.Ed.2d 552 (1984); *Fisher,* 425 U.S. at 410, 96 S.Ct. at 1581; *In re Grand Jury Proceedings,* 745 F.2d 1250, 1251 (9th Cir. 1984). The danger presented is that by

---

4. The district court's decision may also be sustained on the alternative basis that no seizure occurred. Black does not complain of George's receipt of Oxford documents during her employment with Black or at the time of her termination. These transfers took place long before government agents contacted George and therefore do not raise colorable Fourth Amendment concerns. *See Veatch,* 674 F.2d at 1221; *Sherwin,* 539 F.2d at 6. Rather, Black contends that George's turning over the Oxford documents to Karamanos constituted a seizure.

The government's acceptance of documents obtained in a private search and voluntarily

relinquished to government agents does not constitute a seizure, however. *Sherwin,* 539 F.2d at 7–8; *see Coolidge,* 403 U.S. at 488–89, 91 S.Ct. at 2049–50. Again, the question raised is whether George's conduct was in fact voluntary or coerced. *See Sherwin,* 539 F.2d at 7–8. Because we resolve this question against Black, we conclude that no seizure occurred for Fourth Amendment purposes.

5. The omission of the ampersand from the firm name was one of many inconsistencies between the forged slips and their actual counterparts established by Lamb's testimony.

enforcing subpoenas courts may compel tacit admissions that the papers demanded exist, that they are in the defendant's possession, and that they are authentic. *See Doe*, 104 S.Ct. at 1242, 1243 n. 11. The government concedes that Black may enjoy such a privilege, *see In re Grand Jury Subpoenas Duces Tecum*, 722 F.2d 981, 986–87 (2d Cir.1983) (the "act of production" doctrine applies to corporate records in the hands of a former corporate officer whose relationship with the corporation has ended), but asserts that Black waived his privilege by taking the stand and testifying at trial.

■■■■■ A defendant who testifies at trial waives his Fifth Amendment privilege and may be cross-examined on matters made relevant by his direct testimony. *Brown v. United States*, 356 U.S. 148, 154–56, 78 S.Ct. 622, 626–27, 2 L.Ed.2d 589 (1958); *accord McGautha v. California*, 402 U.S. 183, 215, 91 S.Ct. 1454, 1471, 28 L.Ed.2d 711 (1971). The scope of the defendant's waiver is coextensive with the scope of relevant cross-examination. *Brown*, 356 U.S. at 154–55, 78 S.Ct. at 626–27; *United States v. Hearst*, 563 F.2d 1331, 1340 (9th Cir.1977) (per curiam), *cert. denied*, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978). Fixing the extent of cross-examination, in turn, is left to the discretion of the trial judge. *United States v. Miranda-Uriarte*, 649 F.2d 1345, 1353 (9th Cir.1981); *United States v. Panza*, 612 F.2d 432, 437 (9th Cir.1979), *cert. denied*, 447 U.S. 925, 100 S.Ct. 3019, 65 L.Ed.2d 1118 (1980).

Black denies that he waived the privilege. He asserts that he did not make any reference to the slips on direct examination. Rather, he has consistently maintained, first, that the futures contracts reflected transactions between Oxford and its clients and not trades made on exchanges and, second, that he had disassociated with Oxford shortly after its inception. Black insists that the district court erred in concluding that he had broached the subject of the London & Atlantic confirmation slips

on direct and thereby waived his privilege with respect to these slips.

■■■■ Black unduly restricts the scope of a defendant's waiver. What the defendant actually discusses on direct does not determine the extent of permissible cross-examination or of his waiver. *Hearst*, 563 F.2d at 1340. Rather, the inquiry is whether "the government's questions are 'reasonably related' to the subjects covered by the defendant's testimony." *Id.; see United States v. Sturgis*, 578 F.2d 1296, 1300–01 (9th Cir.), *cert. denied*, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 430 (1978). In this case, Black's possession of forged Oxford documents is clearly related to the subjects raised by his direct testimony.

■■■■ Black's testimony offered an explanation for Oxford's operations and for his role in those operations. He testified that Oxford took hedging positions with various commodities brokers in case clients wished to take actual delivery of the commodities they had purchased. *E.g.*, 21 R.T. at 1784–85. Black further asserted that Oxford had such an account with London & Atlantic. *Id.* at 1785, 1787. Finally, Black testified that in any event he had not played an active role in Oxford's operations since soon after its formation. Black's account of events and his possession of forged confirmation slips purporting to show transactions made by London & Atlantic on behalf of Oxford and its clients are certainly "reasonably related." Black's testimony put in issue his version of events. He has "'no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts.'" *Brown*, 356 U.S. at 155, 78 S.Ct. at 626 (quoting *Fitzpatrick v. United States*, 178 U.S. 304, 315, 20 S.Ct. 944, 949, 44 L.Ed. 1078 (1900)). By testifying, Black waived his privilege. The district court did not err by compelling the production of Black's documents.

### B. *Authentication*

Black also contends that the district court erred by admitting the slips into evidence because the documents were not

properly authenticated. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). In essence, Black contends that the government failed to make a sufficient showing that Black was responsible for the forged confirmation slips.[6]

The question of authenticity is left to the discretion of the trial judge and is reviewed on appeal under an abuse of discretion standard. *United States v. Spetz*, 721 F.2d 1457, 1476 (9th Cir.1983); *United States v. Perlmuter*, 693 F.2d 1290, 1292 (9th Cir.1982). The government need only make a prima facie showing of authenticity, as "[t]he rule requires only that the court admit evidence if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." 5 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 901(a)[01], at 901–16 to –17 (1983). The credibility or probative force of the evidence offered is, ultimately, an issue for the jury. *See id.* ¶ 901(a)[02], at 901–22. The district court did not abuse its discretion in admitting the slips.

The government must establish the connection between Black and the government's proffered exhibits. The government may prove that connection "by circumstantial, as well as direct, evidence." *United States v. Natale*, 526 F.2d 1160, 1173 (2d Cir.1975), *cert. denied*, 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976). In *Natale*, the authenticity of the evidence was supported by the presence of the defendant at the place where the evidence was discovered. *Id.* Similarly, in the present case the strongest support for the

government's position is that the evidence was in Black's possession at the time the government sought its production. That fact alone should warrant upholding the district court's decision. *Cf. Burgess v. Premier Corp.*, 727 F.2d 826, 835–36 (9th Cir.1984) (the court could find that exhibits were adequately authenticated by the fact of being found in the defendant's warehouse).

Black asserts that he obtained the documents from Oxford at the request of his attorney. This contention addresses the *weight* of the evidence, not its admissibility. Whether the confirmation slips were forgeries, whether the defendant obtained the documents in the fashion he described, or whether he was responsible for their fabrication were all issues for the jury to decide. *See* 5 J. Weinstein & M. Berger, *supra,* ¶ 901(a)[02], at 901–22. The district court did not abuse its discretion in allowing the slips into evidence.

## V.

## THE RESTITUTION ISSUE

As a condition of probation on the 18 mail fraud counts for which Black was not imprisoned, the district court ordered Black to make restitution "in an amount not to exceed $787,000.00 in such amounts and times as determined by the probation officer." The district court based its order on a stipulation agreed to by both parties and entered into evidence as an exhibit. *See Black*, 589 F.Supp. at 598. The stipulation listed 95 investors in Oxford whose losses totaled $787,185. *Id.* at 598–99.

Black argues that the restitution order is improper. We agree. 18 U.S.C. § 3651

---

**6.** Black also contends that at the time the government introduced the documents—during Black's redirect examination—there was no evidence that the documents were either Oxford records or forgeries. Lamb did not testify that the papers were forged until later. Apparently, Black asserts that because of the timing of the government's effort to introduce the confirmation documents the district court erred in letting

the documents in. This contention is meritless. The requirement of showing authenticity is governed by the general approach to issues of conditional relevancy set forth in Rule 104(b). Fed. R.Evid. 901(a) advisory committee note. Under Rule 104(b), the order of proof is committed to the discretion of the trial judge. Rule 104(b) advisory committee note.

authorizes requiring restitution as a condition of probation:[7]

> While on probation and among the conditions thereof, the defendant ... [m]ay be required to make restitution or reparation to aggrieved parties for actual damages or loss caused by the offense for which conviction was had....

Black contends that the district court erred in ordering restitution in excess of $46,250, the amount alleged in the mail fraud counts for which Black was convicted.

He reasons that absent a fully negotiated plea agreement, section 3651 limits the sentencing court to "imposing restitution of amounts charged in counts for which conviction was had." *United States v. Orr,* 691 F.2d 431, 433–34 (9th Cir.1982); *Karrell v. United States,* 181 F.2d 981, 986–87 (9th Cir.), *cert. denied,* 340 U.S. 891, 71 S.Ct. 206, 95 L.Ed. 646 (1950). He was convicted of 19 counts of mail fraud. Of those, six involved the mailing of checks and confirmation slips reflecting various dollar amounts totalling $46,250. The remaining mailings included requests for information sent by prospective investors and promotional material sent by Black that did not mention specific dollar amounts. There is no doubt, however, that the indictment attacked the entire fraudulent scheme. The question Black's argument presents is whether the district court may order restitution based on the amount of loss caused by the entire scheme or whether it is bound by the specific dollar amounts alleged in the various counts of the indictment. The issue is a troublesome one.

The government argues that the district court properly awarded restitution based on the entire amount of the scheme as reflected in the stipulation. It rests its argument on *Phillips v. United States,* 679 F.2d 192 (9th Cir.1982), in which the defendant pleaded guilty to 3 counts of a 26 count indictment for mail fraud. None of the 3 counts alleged a specific amount of loss. As part of the plea bargain, the defendant agreed to pay restitution of $6000, a figure selected as an amount the defendant could pay during the period of his probation. This court affirmed. The panel reasoned that mail fraud entails both an act of using the mails and a fraudulent scheme. Ordering restitution as a part of a plea agreement in an amount caused by the entire scheme, rather than only an amount caused by a particular mailing, the panel concluded, was entirely appropriate. *Id.* at 196.

Black entered into no such plea agreement, however. In *United States v. Gering,* 716 F.2d 615, 622–25 (9th Cir.1983), this court held that the *Phillips* rationale does not extend beyond the plea bargain context. *Id.* at 624. In *Gering,* the district judge ordered restitution of the total amount of contributions by all persons named in the indictment as victims of the defendant's fraudulent scheme. The indictment itself, however, alleged only one mailing per victim for each mail fraud count for a total alleged loss of $739. *Id.* at 622–23. Seeing "no reason to expand the definition of [the mail fraud] 'offense' beyond that circumscribed in the indictment counts," the panel concluded that the district judge lacked authority to impose restitution of amounts beyond those alleged in the indictment. *Id.* at 624–25.

*Gering* leaves the door slightly open to the possibility that restitution in an amount greater than the amounts alleged in the indictment may be fixed as a condition to probation, so long as the greater amount is judicially established. In *Gering,* a postal inspector determined the amount of loss that appeared in the restitution order. In holding this did not amount to being judicially established, this court, noting the "actual damages" requirement of section 3651, observed that "the amount of loss must be established by proof at trial, ... some other judicial determination, ... or

---

7. Because Black's offenses occurred before January 1, 1983, the more detailed provisions of 18 U.S.C. §§ 3579–3580 do not apply.

**1344**

some consensual means," such as a plea agreement. *Id.* at 625 (citations omitted).

 Like *Gering*, here no judicial determination fixing the amount of loss exists. Nor is the restitution award based on a "consensual means." The parties' stipulation cannot supply such a basis. On its face, the stipulation sheds no light on the parties' purpose in agreeing to it. Nor does anything else in the record. reveal their intent. Whether Black would have agreed so readily to the terms of the stipulation had he realized that the stipulation would then serve to fix the measure of restitution is unknown. Also unknown is whether the government intended it to serve that purpose. We conclude, therefore, that the district court erred in using the stipulation as the basis of its award.[8]

 Black was convicted on an indictment alleging specific losses of $46,250. There was no plea agreement, judicial determination, or "consensual means" fixing a greater amount of restitution. The district court erred in ordering restitution of amounts greater than $46,250.

Black's conviction is AFFIRMED. The restitution order is REVERSED and REMANDED for entering the proper probation condition.

---

8. At least one case from another circuit indicates that § 3651 permits the award of restitution based on the parties' stipulation as to the amount of actual loss. *See United States v. Boswell,* 565 F.2d 1338, 1342–43 (5th Cir.) (upholding restitution of all funds deposited in defendants' fraudulent scheme measured by a stipulation agreed to by the parties), *cert. denied,* 439 U.S. 819, 99 S.Ct. 81, 58 L.Ed.2d 110 (1978). In *Boswell,* the stipulation was made during a hearing conducted for the specific purpose of determining the amount of restitution due. Unlike *Boswell,* the purpose which the stipulation was intended to serve in Black's case is unclear; the record does not indicate how the stipulation was used in the trial proceedings. Therefore, we cannot hold that the stipulation may substitute for a judicial determination fixing the restitution award.