**UNITED STATES of America**

v.

**Jerome Steven KUTNER.**

**Crim. A. No. 83–0156.**

United States District Court, E.D. Pennsylvania.

March 10, 1986.

As Amended July 18, 1986.

Elizabeth K. Ainslie, Asst. U.S. Atty., Philadelphia, Pa., for plaintiff.

Paul Rosen, Jack Meyerson, Fred Greenberg, Donald J. Goldberg, Philadelphia, Pa., for defendant.

**1.** Another company called Stop-A-Flat Corporation was also incorporated with Mr. Kutner as president and sole shareholder. The interrela-

## OPINION

CAHN, District Judge.

This case presents the novel issue of how an award of restitution imposed on a criminal defendant in a mail fraud scheme should be distributed among the various victims of the scheme. After having a hearing on this issue, I have concluded that the distribution of restitution should not be limited to only the victims named in the indictment. Therefore, this case will be remanded to a federal magistrate to provide a method for validating and quantifying the losses incurred by the various victims of the scheme.

## I.

This case arose from the dealings of a corporation called Chalfont Industries, Inc. ("Chalfont"). Mr. Jerome Kutner was the president and sole shareholder of Chalfont.[1] In 1977, Mr. Kutner founded Chalfont to market an automotive product known as Stop-A-Flat. The product is a liquid sealant which is pumped into the inside of automobile tires. Reportedly the product would seal tire punctures of less than a certain size and prevent a tire from becoming flat.

Stop-A-Flat was distributed nationally by Chalfont through a network of franchises. Each franchisee was granted a geographical area and was supposed to sell Stop-A-Flat to automobile dealers in their region. These dealers would then install the product in the tires of cars which they sold. Although their was no initial franchise fee, each franchisee was required to make an initial purchase of the product when the franchise was granted. These initial purchases ranged from $5,000 to $100,000.

The government has alleged that this seemingly legitimate franchise system was no more than an elaborate franchise-fraud scheme. The Indictment stated that Mr.

tionship between this corporation and Chalfont was very extensive and, for purposes of this opinion, they will be considered as one entity.

Kutner "devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises made to numerous Stop-A-Flat distributors and potential distributors." Indictment § 5. Most of the distributors were guaranteed that Chalfont would buy back any unsold inventory and this was not done. The postal investigations of Chalfont's activities found that more than fifty distributors have been victimized by this scheme.[2] However, the twenty-nine count indictment specifically named only twenty-two distributors whom had been defrauded.[3]

Although Mr. Kutner maintained that Chalfont was a legitimate business enterprise which had fallen on hard times and was then forced into bankruptcy, he agreed to plea nolo contendere to the charges against him. I agreed to accept the nolo contendere pleas on the condition that elongated sentencing hearings would be held. The purpose of these hearings was to determine whether pervasive fraud existed in this scheme as the government contended or whether it was merely a case of unrealistic statements being made to keep a troubled business from becoming insolvent. After lengthy hearings, I concluded that there was not sufficient evidence to prove pervasive fraud as alleged by the government. However, there did exist numerous instances of deliberate misrepresentation by Chalfont and Mr. Kutner.[4]

On May 21, 1984, I sentenced the defendant to two years in jail and placed him on probation for five years commencing with his release from prison. As a condition of probation, the defendant was ordered to pay restitution in the amount of $500,000 which was to be distributed among the twenty-two victims named in the indictment. The defendant appealed this sentence to the United States Court of Appeals for the Third Circuit.

In August of 1985 the defendant filed a motion for modification of his sentence in light of his economic condition and pursuant to my comments at the sentencing.[5] An agreement was reached between the government and Mr. Kutner whereby the defendant would pay $500,000 in restitution and dismiss his pending appeal. The government would not oppose a modification of the sentence of incarceration to a period of work/release. I approved of a modification of the sentence to probation because I felt that it was more important to obtain some restitution for the victims of this scheme rather than merely punish the defendant with a prison term.

The $500,000 was paid to the court along with other money collected from other defendants in this same scheme. It was brought to the attention of this court that the law was unclear as to whether the

---

**2.** The postal investigators mailed out approximately 200 questionnaires to persons who were thought to be possible distributors of Stop-A-Flat. Ninety-nine completed questionnaires were returned to the investigators. These questionnaires were followed up by approximately 62 in person interviews by the postal investigators.

**3.** The postal investigator assigned to the case testified that the U.S. Attorney's office had instructed him to limit the potential number of counts to twenty. This would make the case much more manageable. Testimony of J. Sielski, November 21, 1983, p. 11.

**4.** Specifically, I found that Mr. Kutner committed deliberate misrepresentation in five areas. These were: (1) the misrepresentation of Chalfont's financial data to prospective distributors;

(2) the failure to cease advertising after being notified by General Motors that the product did not do what the advertisements said it would do; (3) the creation of a false testing laboratory and the compilation of false testing results to show the effectiveness of the product; (4) the use of race car driver Bobby Unser as an endorser of the product after he terminated his endorsement arrangement; (5) the misrepresentation that Mr. Kutner graduated from college with a degree in business administration from the University of Miami.

**5.** Mr. Kutner's personal assets were insufficient to pay the $500,000 amount imposed by the court. At the time of sentencing, I agreed to consider a modification of the defendant's sentence so that it would be practical based on the defendant's economic condition or if an attractive restitution program was suggested.

court was restricted in distributing the amount of restitution to only the named victims in the indictment or to all of the victims of the scheme. To allow all of the parties interested in this matter an opportunity to be heard on this legal issue, a hearing was held on November 15, 1985.[6] Also, I allowed all interested parties to file briefs on this issue.

## II.

The power of the federal courts to suspend sentences and place defendants on probation is not an inherent power of the courts, rather it arises from statute. *U.S. v. John Scher Presents, Inc.,* 746 F.2d 959, 961 (3d Cir.1984). The Probation Act, 18 U.S.C. § 3651, provides the power for judges to suspend a sentence and place a defendant on probation upon such terms and conditions as the court deems best. Although judges are granted a broad discretion in determining the terms of probation, the statute does provide certain limitations. The statute states that:

> While on probation and among the conditions thereof, the defendant—
>
> May be required to pay a fine in one or several sums; and
>
> May be required to make restitution or reparation to aggrieved parties for actual damages or loss caused by the offense for which conviction was had; and
>
> May be required to provide for the support of any persons, for whose support he is legally responsible.

18 U.S.C. § 3651. (1982).

This statutory provision requires that restitution payments can only be paid to aggrieved parties and that the amount paid cannot be more than the actual loss suffered from the convicted offense.[7] To decide the appropriate distribution of these restitution amounts, I must examine this section of the Probation Act to determine whether all Stop-A-Flat victims can be considered "aggrieved parties" from the offenses for which the defendant was convicted.

Almost all of the cases which examine the statutory construction of the restitution provision have arisen from a factual scenario different than the case at bar. Those cases usually involve a defendant who claims that he cannot be required to pay an amount in restitution greater than the amount involved in the offense for which he was convicted. Although the present case concerns the distribution of an amount of restitution which has already been paid by the defendant, a review of those cases does provide some precedent for this distribution issue.

The first reported case which dealt with the restitution provision was *U.S. v. Follette,* 32 F.Supp. 953 (E.D.Pa.1940). In that case, the defendant was convicted of embezzlement and conversion of $203.99 of United States postal funds. After pleading guilty, the defendant was given a probationary sentence on the condition that she pay restitution of over $450, the amount paid by the surety to the government. The court determined that it was without power to order restitution in an amount greater than the amount for which the defendant was convicted, i.e., $203.99.

In *Karrell v. U.S.,* 181 F.2d 981 (9th Cir.1950), the Ninth Circuit Court of Appeals extended the *Follette* rationale to a case involving a multicount indictment. A seventeen count indictment accused the defendant of victimizing eighteen veterans of their GI home loans. After a jury found the defendant guilty on six of those counts, the district court ordered restitution paid to all eighteen veterans named in the indict-

---

6. The Assistant U.S. Attorney assigned to this case, Mr. William Carr, is to be commended for his efforts, which went well beyond his official prosecutorial duties. Mr. Carr handled many aspects of the claims processing and researched many of the legal issues involved in the restitution distribution. The court thanks Mr. Carr for his untiring efforts.

7. The Victim and Witness Protection Act of 1982, 18 U.S.C. § 3579, allows a court to sentence a convicted defendant to make restitution, independent of whether the defendant is placed on probation. However, this law did not go into effect until 1983 and has no effect on the present case.

ment. The appellate court explictly adopted the reasoning of *Follette* and held that restitution could not be ordered to any veteran not directly related to the six counts for which the defendant was convicted. Many other courts have adopted this construction of the restitution provision. *See U.S. v. Buechler*, 557 F.2d 1002, 1007 (3d Cir.1977); *U.S. v. Black*, 767 F.2d 1334, 1343 (9th Cir.1985); *U.S. v. Orr*, 691 F.2d 431, 433 (9th Cir.1982) (stating that *Karrell* is the majority rule); *U.S. v. Gering*, 716 F.2d 615, 623 (9th Cir.1983).

All of these cases which adopt the *Karrell* rationale limit the amount a defendant can pay as restitution to the aggregate amount involved in the offenses for which the defendant was convicted. Implicitly, this suggests that restitution can only be paid to the victims named in the offenses for which the defendant was convicted. Similarly, the Third Circuit Court of Appeals seemed to suggest that payments could only be made to the named victims of the indictment. *See U.S. v. John Scher Presents, Inc.*, 746 F.2d 959, 963 (3d Cir. 1984); *U.S. v. Buechler*, 557 F.2d 1002, 1007 (3d Cir.1977). Therefore, this court felt that the correct approach was to limit the payment of restitution to the 22 named victims of the indictment. This solution also eliminated the practical problems of notifying each victim and then computing and verifying each victim's losses. Also, given the fact that a set sum has been provided for restitution, the enlargement of the class of victims would decrease the amount of payments to the 22 named victims who cooperated with the postal investigators and some of whom testified at the sentencing hearings.

■ For these reasons, I stated at the sentencing that restitution payments should be limited to the 22 named victims in the indictment. Similarly, when the court established a proposed distribution order before the November 15, 1985 hearing on this matter, the payments were limited to the same 22 named victims. However, on reconsideration of this matter at the hearing and in light of a recent decision by the Third Circuit Court of Appeals, I now conclude that the restitution payments should be made to all distributors and potential distributors of Stop-A-Flat.

### III.

A narrow exception has been carved out of the restitution provision as interpreted by the *Karrell* rationale. This exception was highlighted in the case of *Phillips v. U.S.*, 679 F.2d 192 (9th Cir.1982). Pursuant to a plea bargain, the defendant plead guilty to three counts of a twenty six count indictment which alleged mail fraud and use of a fictitious name to defraud. At the time of the guilty plea, the defendant explicitly agreed to the court's ordering an amount of restitution that would not be limited to the amounts as set forth in the convicted offenses. The defendant was given a probationary sentence requiring restitution payments of an amount which was more than the amounts in the convicted offenses.

On writ of habeas corpus, the defendant challenged his sentence in regard to the amount of restitution. The court stated that "(w)e feel that when a defendant consents pursuant to a plea agreement to pay such a restitutionary amount and such plea bargain is fully explored in open court ..., then the Court is bound by law to carry out that specific agreement." *Id.* at 194. Secondly, the circuit court analyzed the definition of the word "offense" in the restitution statute. "(I)n mail fraud cases, 'offense' includes the fraudulent scheme alleged as an element of the offense and restitution may be ordered in an amount caused by the entire scheme rather than only in the amount caused by a particular mailing." *Id.* at 196. For both of the above reasons, the appellate court allowed the payment of restitution to be greater than the amount for which the defendant was convicted. Other courts have adopted this exception to the majority rule. *See U.S. v. Elkin*, 731 F.2d 1005 (2d Cir.1984) (court held that *Phillips* didn't apply to the facts of that case); *U.S. v. Davies*, 683 F.2d

1052 (7th Cir.1982); *U.S. v. Landay*, 513 F.2d 306 (5th Cir.1975).

A recent Third Circuit Court of Appeals case has also adopted this rationale. In *U.S. v. Pivirotto*, 775 F.2d 82 (3d Cir.1985), the defendant pleaded guilty to two counts of a thirty five count mail fraud indictment. The judge suspended sentence on one of the counts and placed the defendant on probation. As a condition of probation, the judge ordered restitution in an amount that represented the losses of all of the victims of the scheme. Relying on the *Buechler* decision, the defendant challenged the restitution payment as being greater than the amount involved in the particular offense for which he was convicted.

The appellate court considered the defendant's arguments but still affirmed the district court's condition that restitution be paid in an amount equal to the losses of all of the investors. The court distinguished *Buechler* because restitution payments in that case were part of the defendant's sentence and not a condition of probation. Also, the court cited the *Phillips* case which held that plea bargaining situations with multiple count indictments pose a special problem for payment of restitution to victims. Finally, after finding some authority in other circuits to support their position, *see Phillips v. U.S.*, 679 F.2d 192 (9th Cir.1982); *U.S. v. Tiler*, 602 F.2d 30 (2d Cir.1979), the Third Circuit stated that:

> [t]he offense (mail fraud) is a scheme to defraud, and each count is simply an act in furtherance of the unitary scheme; therefore, establishing that a single count caused a specific loss would be difficult. It is the overall scheme that is central to all the counts and gives rise to the victims' financial loss.

The appellate court explicitly adopted the reasoning of the *Phillips* court and affirmed the district court's decision to require the defendant to pay restitution to all of the victims of the scheme.

▮ The case at bar seems to fit clearly into the exception carved out by *Phillips* and *Pivirotto*. First, this case involves a multicount plea bargain agreement which was discussed openly in court. Secondly, each count of the mail fraud scheme can be characterized as involving all of the victims of the scheme. The mailing of a letter as part of the fraud could be viewed as a unitary action which defrauds all of the persons who suffered losses. The indictment makes this clear by stating that the defendant tried to defraud "numerous Stop-A-Flat distributors and potential distributors." Indictment § 5. Every distributor of Stop-A-Flat could be viewed as a victim of each count of the mail fraud scheme. Therefore, the court could award them restitution as an aggrieved party.

Thirdly, limiting the payment of restitution to only the named victims in the indictment would create many practical problems for the judicial system. *See U.S. v. Davies*, 683 F.2d 1052 (7th Cir.1982); *U.S. v. McLaughlin*, 512 F.Supp. 907 (D.Md.1981). Prosecutors would be forced to draw up indictments with hundred of counts which list every victim of a scheme. If a prosecutor didn't do that, it would preempt the possibility that restitution would ever be paid to those unnamed persons. Also, plea agreements would be very difficult to negotiate since pleading guilty to a few counts in a multi-count indictment would preclude restitution to the victims in the counts which were dismissed pursuant to a plea bargain. Thus, following the rule of restricting the payment of restitution to named victims would severely handicap a prosecutor's discretion in many areas.

Finally, several courts have dealt directly with the issue of who can receive restitution payments. In *U.S. v. Orr*, 691 F.2d 431, 434 (9th Cir.1982), the defendant argued that restitution could not be ordered to a party not named in the count for which probation was ordered. The appellate court dismissed this argument by stating that they "find nothing in the language of the statute which requires such an interpretation." *Id.* In another case, the court ordered that restitution be paid to over 30,000 defrauded customers even though they were not named in any of the 50 counts of mail fraud for which the defend-

ant was convicted. *U.S. v. Roberts,* 619 F.2d 1 (7th Cir.1979). *But see U.S. v. Elkin,* 731 F.2d 1005, 1013 (2d Cir.1984).

All of these reasons persuade the court that it has the authority to order that restitution be paid to all of the victims of the Stop-A-Flat scheme. Many Stop-A-Flat distributors lost money and it seems inherently unfair to allow less than all of those victims to receive restitution. The postal investigator stated that the indictment was limited to approximately twenty counts to make the case more manageable. Testimony of J. Sielski, Nov. 21, 1983, p. 11. Since manageability is the only reason for distinguishing between the two groups of distributors, this court feels compelled by the interests of fairness to order that the restitution should be distributed to all of the victims of the Stop-A-Flat scheme.[8]

### IV.

■ Another problem which must be dealt with is the "actual damages" requirement of the restitution statute. This provision limits the amount of restitution that can be paid to a victim to the actual loss caused by the convicted offense. Courts have construed this clause to require that the amount of loss has been established by proof at trial, some other judicial determination or some consenual means. *U.S. v. Gering,* 716 F.2d 615, 625 (9th Cir.1983). For example, in the *Roberts* case, a judge ordered restitution to thousands of victims who had been victimized by a prepayment mail fraud scheme. This was allowed because the names and addresses of the victims as well as the specific amount of loss of each victim was known to the court. Relying heavily on the *Roberts* case, the court in *U.S. v. Davies,* 683 F.2d 1052 (7th Cir.1982) expounded on this rule.

We are persuaded that a court acts within the limits of legislatively granted authority when it imposes restitution in the amount of actual damage and loss to the victim, even if that exceeds the amount in the counts pleaded to, when (a) the defendant has obtained the proceeds as part of an ongoing scheme to defraud which extends over time, and (b) the amount of the damages to the victim has been established with specificity and admitted to by the defendant in the indictment, the plea agreement, and plea and presentence proceedings.

*Id.* at 1054.

To determine the actual losses for each victim, I am remanding this case to a federal magistrate to process and compute the losses as to each victim in the Stop-A-Flat scheme. Losses will be limited to only the amount of money paid to Chalfont by distributors or potential distributors of Stop-A-Flat. Some financial records have been obtained from Chalfont and this data can be used to verify these losses. Losses incurred from advertising, travel or other similar expenses will not be calculated as part of the actual damages caused by the convicted offense. The magistrate is directed to compute the total loss to all of those victims and then distribute the restitution funds on a pro rata basis.

---

**8.** At oral argument, an issue was raised concerning the standing of victims to appeal this decision on how to distribute the restitution. It is not necessary for me to decide this appellate issue, nor has it influenced my decision on how to distribute the funds in any way.