892 F.2d 1047
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Melvin Lloyd RICHARDS and Jerome V. Saitta, Defendant-Appellants.
 Nos. 87-5362, 87-5363.
 United States Court of Appeals, Ninth Circuit.
 Case No. 87-5362 Argued and Submitted Oct. 6, 1989.
Case No. 87-5363 Submitted Oct. 6, 1989.*
Decided Dec. 29, 1989.
 
 Before WALLACE, PREGERSON and ALARCON, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Appellants Melvin Lloyd Richards and Jerome V. Saitta timely appeal from the judgment following their conviction by a jury for conspiracy to commit mail fraud and conspiracy to defraud the United States in violation of 18 U.S.C. § 371, aiding in the filing of false tax returns in violation of 26 U.S.C. § 7206(2) and mail fraud in violation of 18 U.S.C. § 1341.[1]
 
 
 3
 Richards and Saitta contend that the evidence produced at trial was insufficient to show that they had an intent to defraud or deceive investors or the United States.
 
 
 4
 In addition, Richards seeks review on the following grounds:
 
 
 5
 One. The motion to suppress evidence should have been granted by the district court because the documents were taken by private persons acting as government agents.
 
 
 6
 Two. All counts of the indictment should have been dismissed by the district court because the tax shelter plan provided for legitimate tax deductions.
 
 
 7
 Three. Richards asserts that he was not given fair prior warning and notice that his conduct was unlawful.
 
 
 8
 Four. The mail fraud counts should have been dismissed by the district court because the mailings were not in furtherance of any scheme.
 
 
 9
 We disagree and affirm.
 
 
 10
 * The indictment against Richards and Saitta arose from a plan to raise money to finance the development of a uranium claim in New Mexico. The uranium claim was one of many claims owned by Richards' family and leased to a company called Midas International, Inc. Richards and his family maintained a royalty interest in the minerals mined from the claims.
 
 
 11
 In 1980, Richards was interested in raising money to finance the development of the uranium claim. Saitta was aware of this interest and introduced Richards to defendant Fryer. Fryer proposed that appellants offer a tax program in which investors could sublease a portion of the uranium property. The $5,000 purchase price would then be directed by Midas to a mining company, called Power Resources, for development of the uranium deposits. The investor would then sell an option to purchase 50% of the investors' interest to a third-party option holder for $20,000. The original investor would direct payment of the $20,000 directly to Power Resources. The result was that investors would be eligible to take a $25,000 tax deduction for each $5,000 they invested. Richards accepted the proposal and the program was marketed to investors in 1980 under the name "Uranium for Tax Dollars."
 
 
 12
 Richards and Saitta arranged for Asian Pacific Holding and its wholly owned subsidiary Asian Pacific Trading to serve as the option holder for the tax shelter plan. In late 1980, however, Asian Pacific's participation was terminated. Attempts to find a new option holder failed. Instead, a bank account in the name of Asian Pacific Holding was opened in Liechtenstein to give the false appearance that Asian Pacific was the option holder. The illusion was created by the implementation of a "check rolling" process. The investors' $5,000 purchase price was first deposited into a Midas bank account. The purchase price was then transferred into a Power Resources account and, finally, transferred again to the bank account in Liechtenstein. The money would then come back from Liechtenstein to Power Resources in the form of checks, purportedly for option purchases. The investors' purchase price would then be sent out again through the entire cycle to give the appearance that a large amount of money was being paid to Power Resources from Asian Pacific Holding, the purported option holder in Liechtenstein.
 
 
 13
 In 1981, Richards and Saitta marketed another "Uranium for Tax Dollars" program. The purported option holder was again Asian Pacific. Photocopies of fictitious checks were prepared to deceive others into the belief that Asian Pacific was the option holder.
 
 II
 
 14
 SUFFICIENCY OF EVIDENCE TO SUPPORT APPELLANTS' CONVICTIONS
 
 
 15
 Richards and Saitta assert that the evidence is insufficient to sustain their convictions under 18 U.S.C. § 371 because the government failed to establish that they intended to defraud investors or the United States.
 
 
 16
 There is sufficient evidence to support a conviction if, after reviewing the evidence in the light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Bonanno, 852 F.2d 434, 440 (9th Cir.1988), cert. denied, 109 S.Ct. 812 (1989). The credibility of witnesses and the weight accorded to the evidence are questions for the jury and are not reviewable by this court. United States v. Vaccaro, 816 F.2d 443, 454 (9th Cir.), cert. denied, 484 U.S. 914 (1987).
 
 
 17
 Saitta was a part of the tax shelter plan from its inception. Saitta was responsible for arranging the initial meeting between Richards and defendant Fryer. This meeting led to the implementation of the tax shelter program. Saitta also made a special trip to Liechtenstein so that he and defendant Bradpiece could make the necessary arrangements to create the fictitious option holder. The jury also heard testimony that Saitta was present when defendant Bradpiece typed the fictitious checks for the "check rolling" scheme. The record shows that Saitta was in charge of promoting the program for investors. In inducing investments, Saitta falsely represented that Asian Pacific was the option holder.
 
 
 18
 Richards was present at the preliminary planning meetings at which defendant Fryer presented the tax shelter plan and explained the necessity of having an option holder. Richards testified that he had full knowledge that no option holder existed. Nevertheless, Richards represented to investors that a legitimate option holder existed. The record also shows that Richards furnished money to help perpetuate the illusion that a valid option holder existed.
 
 
 19
 The false representation that a legitimate option holder existed was a material and key factor to the successful marketing of the fraudulent scheme. Several investors testified that they would not have invested had they known that an option holder did not exist. Viewing the evidence in the light most favorable to the government, we conclude that a rational juror could have found that Saitta and Richards intended to defraud investors and the United States.
 
 III
 MOTION TO SUPPRESS EVIDENCE
 
 20
 Richards contends that the district court erred in denying his motion to suppress certain papers seized from the Midas office by private persons. He argues that these documents were the fruits of warrantless and unauthorized government activity.
 
 
 21
 We review a district court's findings of fact in suppression hearings under the clearly erroneous standard. United States v. Walther, 652 F.2d 788, 791 (9th Cir.1981). The question whether the district court's denial of Richards' motion to suppress was error is a mixed question of law and fact. United States v. McConney 728 F.2d 1195, 1204-1205 (9th Cir.), cert. denied, 469 U.S. 824 (1984). This circuit has not decided what standard of review must be applied to appeals challenging the validity of a private search. See United States v. Snowadzki, 723 F.2d 1427, 1429 (9th Cir.), cert. denied, 469 U.S. 839 (1984); United States v. Miller, 688 F.2d 652, 657 n. 3 (9th Cir.1982); United States v. Walther, 652 F.2d at 791. Because the district court's decision to deny the motion to suppress was proper under both the de novo and the clearly erroneous standards, we do not reach the issue which standard applies.
 
 
 22
 Richards' first assertion is that the periodic removal of various documents from his office by Christopher Taylor, president of Midas, and Thomas Heckenkamp, vice president of Midas, was a violation of his constitutional rights because they were acting as government agents.
 
 
 23
 A search conducted by a private party does not violate the fourth amendment. Walter v. United States, 447 U.S. 649, 656 (1980); United States v. Walther, 652 F.2d at 791. If the private party conducts the search as an agent or instrumentality of the state, however, fourth amendment interests are implicated. Coolidge v. New Hampshire, 403 U.S. 443, 487 (1971); United States v. Miller, 688 F.2d at 657. In distinguishing between government and private searches, we consider two factors: "(1) Whether the government knew of and acquiesced in the intrusive conduct, and (2) Whether the party performing the search intended to assist law enforcement efforts or to further his own ends." United States v. Black, 767 F.2d 1334, 1339 (9th Cir.), cert. denied, 474 U.S. 1022 (1985). The party objecting to the evidence has the burden of establishing the involvement of a government agent. United States v. Miller, 688 F.2d at 657.
 
 
 24
 Richards and Heckenkamp did not ask for or receive any assistance or advice from F.B.I. special agent Mattingly in respect to the conduct of their investigation. In addition, Mattingly did not advise or encourage the employees to search for any documents at Midas. Mattingly was not present when Taylor and Heckenkamp conducted the searches in the spring of 1982.
 
 
 25
 The evidence shows that Taylor and Heckenkamp had personal reasons for conducting the investigation. As high level officers in the company, they were concerned about the effect of any illegal conduct on their finances and the possibility that they might be liable for Richards' acts.
 
 
 26
 When fellow employees gather evidence without the knowledge or acquiescence of government officials, their activity is private, notwithstanding their expectation that a criminal prosecution will follow. See United States v. Black, 767 F.2d at 1339-1340 (private citizen's wish to aid the government did not turn her into a government agent when her decision to help the government was made to advance her own personal interests). The district court did not err in concluding that Taylor and Heckenkamp conducted the searches as private citizens.
 
 
 27
 Richards next argues that the removal of documents on May 21, 1982 by Taylor and F.B.I. agent Mattingly from the Midas office violated his fourth amendment rights. The district court found that Taylor, as president of Midas, was a lawful custodian of documents and a proper party to serve with the subpoena. Richards contends that Taylor did not have the authority to allow Mattingly to remove documents pursuant to a subpoena duces tecum.
 
 
 28
 A summons may be served on a corporation through an officer or agent of the corporation. See Fed.R.Civ.P. 4(d)(3). Service of a summons may also be made upon a representative of the corporation who is "so integrated with the organization that he will know what to do with the papers. Generally, service is sufficient when made upon an individual who stands in such a position as to render it fair, reasonable and just to imply the authority on his part to receive service." Direct Mail Specialists, Inc. v. Eclat Computerized Technologies, Inc., 840 F.2d 685, 688 (9th Cir.1988) (quoting Top Form Mills, Inc. v. Sociedad Nationale Industria Applicazioni Viscosa, 428 F.Supp. 1237, 1251 (S.D.N.Y.1977)). Taylor was the president and chief executive officer of Midas and was solely in charge of Midas' gun division. As president of Midas, Taylor was both aware and in control of many of Midas' financial dealings. Taylor was an officer of the corporation and as such was authorized by Rule 4(d)(3) to accept service of the subpoena duces tecum. The extent of Taylor's involvement, responsibility, and knowledge of corporate affairs also justified agent Mattingly's impression that Taylor was implicitly authorized to accept service of the subpoena. The district court correctly found that Taylor was authorized to accept service of a subpoena duces tecum for the corporate records of Midas.
 
 
 29
 Richards further argues that the removal of documents by agent Mattingly was an illegal search because Taylor lacked authority to consent to the search. All of Midas' business operations were conducted in an office building in Glendale, California. Taylor shared the office space at Midas with several employees, including Richards. Mattingly removed only one cabinet from Midas' premises. The cabinet contained corporate records which were specified in the subpoena duces tecum. No other searches or seizures were conducted by Mattingly. Co-inhabitants have the right to permit inspections, without the permission of other co-inhabitants. See United States v. Matlock, 415 U.S. 164, 171 (1974). The district court was correct in finding that the search on May 21, 1982 was lawfully conducted pursuant to a subpoena duces tecum.
 
 
 30
 Lastly, Richards contends that Mattingly was guilty of outrageous conduct in that he encouraged Taylor and Heckenkamp to conduct searches and illegally remove documents from the Midas office. Richards argues that these acts require dismissal of the indictment. To mandate dismissal, governmental conduct must be "so grossly shocking and so outrageous as to violate the universal sense of justice." United States v. Pemberton, 853 F.2d 730, 735 (9th Cir.1988).
 
 
 31
 As set forth above, the record shows that Taylor and Heckenkamp were acting as private citizens in conducting searches, and that Mattingly was authorized to remove the documents from the Midas office pursuant to a subpoena duces tecum. Accordingly, the district court correctly determined that Mattingly was not guilty of grossly shocking or outrageous conduct. The district court did not err in denying the motion to suppress.
 
 IV
 MOTION TO DISMISS THE INDICTMENT
 
 32
 Richards asserts that the district court erred in denying his motion to dismiss the indictment because the investors were legally entitled to deduct the amount of the investment and the option payments.
 
 
 33
 An order denying the dismissal of an indictment is subject to de novo review. United States v. Givens, 767 F.2d 574, 584 (9th Cir.), cert. denied, 474 U.S. 953 (1985).
 
 
 34
 A. Applicability of Section 616(a) to Illusory Transactions
 
 
 35
 26 U.S.C. § 616(a) provides in pertinent part that "there shall be allowed as a deduction in computing taxable income all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit...." Accordingly, the money expended by an option holder for uranium development is deductible under 26 U.S.C. § 616(a).
 
 
 36
 In the instant case, however, the record shows that no cash disbursement was made by an option holder. Instead, appellants created documents to cause investors to believe that a cash transaction had occurred between the option holder and the development company. Each investor received a written acknowledgment stating: "Simultaneously with the execution of this Agreement, Contractor has been paid the full amount of the investor's contribution plus the option premium and in executing this Agreement, Contractor acknowledges receipt of the said sum." The district court properly found that the tax deductions were not legitimate under 26 U.S.C. § 616(a) because there was no actual cash disbursement.
 
 B. Accrual Method of Accounting
 
 37
 Richards also contends that the investors were entitled to deduct the development expenses because they were required to use an accrual method of accounting.
 
 
 38
 Treas.Reg. § 1.446-1(c)(2)(i) requires that an accrual method of accounting must be used for purchases and sales when it is necessary to maintain an inventory. Under the accrual method of accounting, "deductions are allowable for the taxable year in which all the events have occurred which establish the fact of the liability giving rise to such deduction ..." Treas.Reg. § 1.446-1(c)(1)(ii).
 
 
 39
 Although tests were conducted to determine whether the Midas claim contained uranium, none was extracted in connection with the tax shelter plan. Therefore, there was no inventory. In addition, the investors' funds were not used for purchases or sales. Thus, under the clear language of the statute, the investors were not required to use an accrual method of accounting and were not entitled to deduct the development expenses. See TreasReg. § 1.446-1(c)(1)(ii).
 
 C. Lack of Notice of Illegality of Conduct
 
 40
 Finally, Richards claims that he did not have notice that his conduct was unlawful. Accordingly, he asserts that prosecution for his activities would be a violation of the law of this circuit as explained in United States v. Dahlstrom, 713 F.2d 1423 (9th Cir.1983), cert. denied, 466 U.S. 980 (1984).
 
 
 41
 In Dahlstrom we held that an individual cannot be prosecuted for merely advocating a tax shelter program. Id. at 1428. The record must show a specific intent to violate the law. Id. at 1427. To prove specific intent to defraud, the government must show that an individual had "fair notice as to what constitutes illegal conduct". Id. at 1427.
 
 
 42
 Richards asserts that he was not given fair notice and warning that the lack of a valid option holder would turn the otherwise legal tax shelter plan into an illegal transaction. Whether or not the tax shelter plan would have been legal had a valid option holder existed is immaterial. The question under Dahlstrom is whether Richards had fair notice and warning that false misrepresentations and fraudulent marketing would constitute illegal conduct.
 
 
 43
 When there is no economic substance to a tax avoidance plan, it is a sham transaction. See Knetsch v. United States, 364 U.S. 361, 364-65 (1960) (transaction between a taxpayer and an insurance company was held to be a sham transaction because the transaction failed to create any indebtedness within the meaning of the relevant sections of the Internal Revenue Code). The law is well settled that sham transactions are illegal. United States v. Clardy, 612 F.2d 1139, 1152-53 (9th Cir.1980).
 
 
 44
 Richards was aware at all times that there was no valid option holder and that the trust in Liechtenstein was only an illusionary option holder. Thus, there was no economic substance to Richards' representations to investors that their tax deductions were legitimate because the option holder was providing funds for development.
 
 
 45
 A person who is "involved in orchestrating the generation of the questionable tax deduction" has engaged in conduct beyond mere advocacy of a tax shelter program. United States v. Schulman, 817 F.2d 1355, 1359 (9th Cir.), cert. dismissed, 483 U.S. 1042 (1987). The record shows that Richards' conduct went far beyond mere advocacy. He falsely represented that a valid option holder existed and assisted in preparing false documents and checks to deceive the investors. The circumstantial evidence presented in this matter demonstrates that Richards had the specific intent to violate the tax law barring the filing of false tax returns and used the mails to defraud.
 
 
 46
 Richards had ample notice that his conduct was unlawful. The district court did not err in denying Richards' motion to dismiss the indictment.
 
 V
 MOTION TO DISMISS THE MAIL FRAUD COUNTS
 
 47
 Richards claims that the district court erred in denying his motion to dismiss the mail fraud counts because the mailings were not in furtherance of any fraud or scheme. We review the denial of the motion to dismiss the mail fraud counts de novo. McConney, 728 F.2d at 1201.
 
 
 48
 The essential elements of mail fraud are a scheme to defraud and knowing use of the United States mail to execute the scheme. 18 U.S.C. § 1341 (1983); United States v. Kaplan, 554 F.2d 958, 965 (9th Cir.) cert. denied, 434 U.S. 956 (1977).
 
 
 49
 Richards argues that because the investors did not receive the mailings until after they paid the purchase price, the mailings were received after the successful completion of the alleged scheme to defraud.
 
 
 50
 Mailings are fraudulent if posted after an alleged scheme has caused the investor to part with his money and if they are designed to lull investors into a false sense of security. United States v. Sampson, 371 U.S. 75, 80-81 (1962); United States v. Feldman, 853 F.2d 648, 655 (9th Cir.1988), cert. denied, 109 S.Ct. 1164 (1989). The mailings sent to the investors in the instant matter fraudulently reassured investors that an option holder existed and that money was being sent to Power Resources for development of the uranium claims. The investors also relied on information received from Midas in a Schedule C form to determine their eligibility for income tax deductions. These materials created an illusory aura of legitimacy for the scheme.
 
 
 51
 Richards also asserts that the doctrine of McNally v. United States, 483 U.S. 350 (1987), compels dismissal of the mail fraud charges. Richards argues that neither the investors or the United States suffered a tangible loss of property because of the tax shelter plan.
 
 
 52
 In McNally, the court held that the mail fraud statute does not protect intangible rights. Instead, the record must show a deprivation of a property right. Id. at 360. McNally, however, is distinguishable from the matter sub judice. As of 1987, no investor had received any return or refund on his $5,000 investment. This evidence thus demonstrates that the investors were deprived of a property right.
 
 
 53
 The United States was also deprived of a property right as required by McNally. A total of $28,527,000 was deducted from income tax returns by the investors in the tax shelter program. The taxpayers based these deductions on both the amount of their investment and the amount of the alleged option payment. The actual investor contribution was only $6,267,500. Thus, the United States did not receive accurate tax returns concerning more than $22 million dollars.
 
 
 54
 Because the mailings were in furtherance of a scheme to defraud, and the United States and the investors were deprived of tangible property rights, the district court properly denied the motion to dismiss the mail fraud counts.
 
 
 55
 AFFIRMED.
 
 
 
 *
 The panel unanimously finds this case suitable for submission on the record and briefs and without oral argument pursuant to Fed.R.App.P. 34(a), Ninth Circuit Rule 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Three other defendants were also indicted. Defendants Sidney Bradpiece and Michael Aaron Fryer pled guilty prior to trial. Defendant Allen C. Stout's trial resulted in a mistrial and on November 23, 1987, the district court granted a motion for Judgment of Acquittal pursuant to Federal Rule Criminal Procedure 29. These defendants are not before the court