**Commonwealth** of the
Northern Mariana Islands,
Plaintiff/Appellee,
v.
Francisco M. **Cabrera**,
Defendant/Appellant.
Appeal No. 93-026
Criminal Case No. 92-0090
April 7, 1995

Argued and Submitted July 15, 1994

Counsel for appellant: Douglas F. Cushnie, Saipan.

Counsel for appellee: Russell E. Marsh, Assistant Attorney General, Saipan.

BEFORE: DELA CRUZ, Chief Justice, and VILLAGOMEZ and ATALIG, Justices.

VILLAGOMEZ, Justice:

■ Francisco M. Cabrera appeals his conviction and sentence for the offense of delivery of methamphetamine hydrochloride, a crystalline, controlled substance more commonly known as "ice." The jury rejected Cabrera's defense of entrapment.

We have jurisdiction over this appeal pursuant to 1 CMC § 3102(a). We affirm Cabrera's conviction but vacate the sentence imposed because of our belief that the trial court misinterpreted the sentencing statute.

## ISSUES

Cabrera raises six issues for our review:

1. Whether the court erred in admitting Cabrera's confession.

2. Whether the court erred in admitting into evidence: (a) two packets of ice allegedly sold by Cabrera (Exhibit 8); (b) a list of serial numbers of the $100 bills allegedly used to buy the ice sold by Cabrera (Exhibit 1); or (c) the $100 bills themselves (Exhibit 3).

3. Whether the court erred in denying Cabrera's motion for a judgment of acquittal.

4. Whether the court erroneously instructed the jury as to the burden of proof for the defense of entrapment.

5. Whether the trial court erred in sentencing Cabrera under 6 CMC § 2141(b)(1).

6. Whether Cabrera's conviction and sentence should be reversed due to cumulative error.[1]

---

[1] We do not reach this issue because we affirm as to all questions pertaining to Cabrera's conviction, compare *Commonwealth v. Saimon*, 3 N.M.I. 365, 399 (1992) (holding that no cumulative error exists where court affirms on all other issues), and vacate his sentence on grounds other than cumulative error.

## FACTUAL & PROCEDURAL BACKGROUND

On May 20, 1992, Cabrera approached Frank Camacho, a friend and fellow Department of Public Works employee with whom Cabrera had smoked ice in the past. Cabrera offered to sell Camacho some ice.

Camacho, it turned out, was a police informant ("the informant"). The informant called Officer Norita of the Department of Public Safety (DPS) and told him about Cabrera's offer. The informant, Norita, and DPS agents planned a "buy-bust," or police-controlled purchase of the ice by the informant, for that afternoon. Under the scheme, the informant would "buy" three packets of ice from Cabrera with money provided by the police. The police would monitor the transaction from a nearby location and then arrest Cabrera upon completion of the "sale."

DPS Agent Sokau gave the informant fifteen $100 bills, totaling $1,500. Sokau prepared a receipt that listed the serial number of each bill.

The informant proceeded to a location pre-arranged with Cabrera. In the informant's car, Cabrera gave him at least two packets containing a crystalline substance,[2] and the informant paid Cabrera $1,500.

At a signal from the informant, nearby DPS agents approached the scene and arrested Cabrera. They took him to DPS headquarters, strip-searched him, and found another packet of what appeared to be ice in his sock.

A DPS officer read Cabrera his constitutional rights from a DPS standard rights form. Cabrera initialed each paragraph of the form to indicate that he understood his rights, then signed at the bottom of the form to signify that he wanted to waive his rights.

Sokau questioned Cabrera for two-and-one-half hours. Cabrera confessed to having sold ice to the informant. Sokau reduced Cabrera's statement to writing and Cabrera signed it.

A DPS agent recovered two packets containing a crystalline substance from the informant's car. The informant said that they were the packets he purchased from Cabrera. Tests at DPS headquarters and later at the Guam Crime Laboratory indicated that the crystalline substance was ice.

By a three-count amended information, the government charged Cabrera with the following drug offenses: possession of a controlled substance (ice) with intent to

---

[2] The parties dispute whether Cabrera gave the informant three bags of ice, or only two. The route taken by the two packets in question (Exhibit 8), from seizure by the police to introduction at trial, is discussed in detail in Analysis section II(B), *infra*.

deliver,[3] delivery of a controlled substance (ice),[4] and possession of a controlled substance (marijuana).[5] Cabrera pleaded not guilty at his arraignment on May 22, 1992.

At trial, Cabrera objected to the admission of his confession into evidence.[6] The court heard arguments and overruled the objection, concluding that DPS's rights form adequately advised Cabrera of his rights, and that he confessed voluntarily after being apprised of his rights.[7]

Cabrera also objected to the admission of the ice, list of serial numbers of the fifteen $100 bills, and the $100 bills themselves. The court overruled these objections.

After the government rested its case-in-chief, Cabrera moved for a judgment of acquittal on all three counts. The court granted the motion as to Count III (possession of marijuana).

Cabrera presented evidence and testified that he was entrapped. He then rested and renewed his motion for acquittal on Counts I and II at the close of all the evidence. The court again denied the motion.

The court instructed the jury on the defense of entrapment. The jury found Cabrera not guilty of possession of a controlled substance (ice) with intent to deliver, but found him guilty of delivery of a controlled substance (ice).

At sentencing, the government argued that, under the applicable sentencing statute, the court was required to sentence Cabrera to at least a five-year prison term without suspension, probation or parole. Cabrera contended, however, that the applicable statute did not mandate a prison term, but that, if the court chose to impose a prison term, there was a mandatory minimum.

The court sentenced Cabrera to an eight-year prison term, with three years suspended and five years to be served without parole, probation, or suspension. Cabrera timely appealed.

---

[3] See 6 CMC § 2141(a)(2).

[4] See 6 CMC § 2141(a)(1).

[5] See 6 CMC § 2142.

[6] Cabrera did not make a motion to suppress his confession. Such motions are normally made prior to trial, pursuant to Com. R. Crim. P. 12(b)(3).

[7] Transcript of Proceedings at 143-44, Commonwealth v. Cabrera, Crim. No. 92-0090 (N.M.I. Super. Ct. Mar. 17, 1993).

## ANALYSIS

### I. Admission of Cabrera's Confession

Cabrera contends that DPS's "Your Constitutional Rights" form is constitutionally defective and inadequate, rendering his confession inadmissible per se. He also argues that, assuming the form is adequate, the totality of circumstances made his confession involuntary and it should not have been admitted into evidence.

■ Whether DPS's constitutional rights form is adequate, for purposes of Miranda v. Arizona,[8] is a question of law reviewable de novo.[9] The issue of the voluntariness of one's confession, under a totality of the circumstances test, is a mixed question of law and fact,[10] but the ultimate issue of voluntariness is a legal question. Our review of either issue is de novo.[11]

■ The U.S. Supreme Court established in Miranda "a procedural mechanism that safeguards the exercise of the [U.S. Constitution's] Fifth Amendment privilege against the inherently coercive effects of custodial interrogation."[12] In order for the government to introduce Cabrera's confession, the confession must have been obtained with proper Miranda safeguards.[13]

We must first examine the adequacy of the constitutional rights form, and then the totality of the circumstances surrounding Cabrera's waiver and confession.

### A. Adequacy of the Constitutional Rights Form

■ Miranda requires, among other things, that an accused be adequately apprised of his or her rights to remain silent and to the presence of retained or appointed

---

[8] 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[9] Commonwealth of the N. Mariana Islands v. Mendiola, 976 F.2d 475, 482 (9th Cir. 1993).

[10] See Commonwealth v. Ramangmau, 4 N.M.I. 227, 235 (1995).

[11] Campbell v. Wood, 18 F.3d 662, 672 (9th Cir. 1994), cert. denied, ___ U.S. ___, 114 S. Ct. 1337, 127 L. Ed. 2d 685 (1994).

[12] Kirsten M. Eriksson, Custodial Interrogations, Project, Twenty-Third Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1992-1993, 82 GEO. L.J. 733, 734 (1994) (footnote omitted).

[13] See id. at 735.

counsel during custodial interrogation.[14] Cabrera, relying on *Commonwealth of the N. Mariana Islands v. Mendiola*,[15] contends that the constitutional rights form read to him by the police, identical to the form used in *Mendiola*, rendered his confession involuntary per se. We are not persuaded that *Mendiola* makes a confession per se inadmissible where the police use the DPS form in question.

In *Mendiola*, the Ninth Circuit found misleading that portion of the form which states:

> I am required by law to make a reasonable effort to send a message by telephone, cable, wireless, messenger or other faster means to a lawyer or counsel, member of your family, your employer or your employer's representative if you so request, if such message can be sent without expense to the government or your [sic] pay in advance any expense there may be to the government. . . .[16]

This paragraph of the form tracks local law and is followed by a standard recitation of *Miranda* rights, including the statements: "You have a right to consult with a lawyer and to have a lawyer present with you while you are being questioned[; y]ou may stop talking to me an any time and demand a lawyer at any time," and "[i]f you want a lawyer but are unable to pay for one, a lawyer will be appointed to represent you free of any cost to you."[17]

The *Mendiola* court found the DPS form misleading because the defendant's "ability to draw the inference that he was entitled to *appointed* counsel before and during questioning was made more tenuous by the [form's] initial statement that a lawyer or other person would not be contacted unless it could be accomplished at no cost to the government."[18] The court expressly refrained from "decid[ing], however, whether this error alone render[ed] Mendiola's confessions inadmissible."[19] Instead, the court ruled the confession inadmissible based on the totality of the circumstances. It concluded that suppression was warranted due to a combination of "the apparent involuntariness of Mendiola's statements, improper police tactics, and faulty *Miranda* warnings."[20] In this case, there are no other circumstances to justify suppression of the confession.[21] Thus, the issue is whether the use of the "Your Constitutional Rights" form alone rendered Cabrera's confession inadmissible.

In *Duckworth v. Eagan*,[22] the U.S. Supreme Court reviewed a constitutional rights form that stated: "'You have a right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning,'"[23] and "'[w]e have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court.'"[24] The Seventh Circuit ruled that these specific statements were misleading. The Supreme Court disagreed, holding that, when considered in the context of the warnings as a whole, the warnings satisfied *Miranda*.[25]

The constitutional rights form used in this case and in *Duckworth* were the same in that one portion was questionable. After considering the warnings in the "Your Constitutional Rights" form as a whole, as the court did with respect to the totality of the warnings given in *Duckworth*, we conclude that the form alone did not warrant suppression of Cabrera's confession.

## B. *Totality of the Circumstances*

Cabrera argues that, under the totality of the circumstances test, his confession was involuntary and inadmissible. In addition to the defect in the constitutional rights form, he points out that (1) he was upset and could only

---

[14] *See Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612, 16 L. Ed. 2d at 706-07; *Ramangmau*, 4 N.M.I. at 235 (citing *Miranda*).

[15] 976 F.2d 475 (9th Cir. 1993).

[16] *Id.* at 482.

[17] Supplemental Excerpts of Record at 1; *Mendiola*, 976 F.2d at 482.

[18] *Mendiola*, 976 F.2d at 483 (emphasis in original).

[19] *Id.*

[20] *Id.* at 486.

[21] *See* discussion in part I(B), *infra*.

[22] 492 U.S. 195, 109 S. Ct. 2875, 106 L. Ed. 2d 166 (1989).

[23] *Id.*, 492 U.S. at 198, 109 S. Ct. at 2877, 106 L. Ed. 2d at 174 (emphasis omitted).

[24] *Id.* (emphasis omitted).

[25] *Id.* 492 U.S. at 205, 109 S. Ct. at 2881, 106 L. Ed. 2d at 178.

think about his family when his rights were being read to him, (2) the rights form is in English and his first language is Chamorro, (3) he was not offered any food or drink during the two-and-one-half hours of questioning, and (4) the officers promised to release and not file charges against him if he cooperated. As discussed below, viewing all of the circumstances of the interrogation, we find that Cabrera waived his *Miranda* rights and confessed voluntarily.

 For a confession to be admissible, the government must establish that the defendant voluntarily waived his or her rights.[26] In assessing the issue of voluntariness, we examine the totality of the circumstances surrounding a defendant's waiver of his or her constitutional rights.[27] The circumstances include the characteristics of the defendant and the details of questioning by the government.[28] Absent coercion on the part of the police, a confession will not be deemed involuntary.[29]

 We have already determined that the use of the DPS constitutional rights form did not, by itself, make Cabrera's confession inadmissible. Our review of the circumstances under which Cabrera was interrogated, in their totality, does not reveal any police coercion or that Cabrera was unable to comprehend, or rationally respond to, the spoken and written warnings, information, and questions posed by the police.

First, the fact that Cabrera felt upset and was thinking of his family did not render him incapable of knowingly waiving his rights. Second, the record establishes that Cabrera understands English, and the interrogating officer spoke both English and Chamorro. Parts of the constitutional rights form were translated into Chamorro for Cabrera. Third, although DPS officers may not have offered Cabrera food or drink, there is no indication either that Cabrera requested something to eat or drink, or that the officers denied him food or drink as a coercive measure. Additionally, Cabrera was not questioned by the police for a prolonged period. Fourth, Cabrera's assertion that he was promised release and that he would not be prosecuted if he cooperated was adequately refuted by witnesses called by the government. The conflicting testimony raised a question of fact which the trial court decided in favor of the government. We are not at liberty to disturb factual findings which hinge on the trial court's assessment of a witness's credibility.[30]

We hold that, applying a totality of the circumstances analysis, Cabrera voluntarily waived his rights and confessed. The trial court did not err by admitting the confession into evidence.

## II. Admissibility of the Money and Ice

Cabrera claims that the ice and fifteen $100 bills were erroneously admitted, without proper foundation. He also asserts that the receipt listing the serial numbers of the fifteen $100 bills was erroneously admitted because it was irrelevant.

 We review the admission of evidence for an abuse of discretion.[31] Where a real or physical object is offered for admission into evidence, the proponent must show that (1) the object was the same one involved in the alleged incident, and (2) the condition of the object is substantially unchanged.[32] For the following reasons, we are unpersuaded by Cabrera's assignments of error.

### A. The List of Serial Numbers and the $100 Bills

 Cabrera claims error on the ground that the government did not present any evidence to show how the police obtained the $1,500 from Cabrera after his arrest. Appellant's Brief at 20. Thus, he argues, the $100 bills were admitted without foundation and the list was irrelevant. We disagree.

Sokau identified the bills at trial through the receipt listing the bills' serial numbers. Sokau testified that he gave the informant fifteen $100 bills to purchase ice from Cabrera.[33] Sokau testified that he prepared the list of the

---

[26] *Ramangmau*, 4 N.M.I. at 235.

[27] *Id.*

[28] *Id.*, 4 N.M.I. at 236.

[29] *Id.*

[30] *See Commonwealth v. Taitano*, 2 CR 356, 360 (D.N.M.I. App. Div. 1985) ("[I]t is not the province of [an appellate court] to reassess the credibility of witnesses") (citation and internal quotation marks omitted); *Manglona v. Kaipat*, 3 N.M.I. 322, 335-36 (1992) (Supreme Court accords particular weight to trial judge's assessment of conflicting and ambiguous testimony of witnesses).

[31] *Saimon*, 3 N.M.I. at 375 n.2.

[32] *United States v. Miller*, 994 F.2d 441, 443 (8th Cir. 1993) (citing Charles T. McCormick, et al., McCORMICK ON EVIDENCE § 212 (2d ed. 1972)).

[33] Transcript of Proceedings, *supra* note 7, at 52.

bills' serial numbers.[34] The trial court admitted the list and the bills over Cabrera's objection.

The list of the bills' serial numbers was relevant to authenticate the bills used and recovered from Cabrera. Through the list of serial numbers, Sokau specifically identified all but one of the fifteen $100 bills.[35] The absence of testimony tracing the bills received after the arrest was not critical in light of the direct testimony given by both Cabrera and the informant. They both testified that the informant gave Cabrera $1,500 for the ice. We find no abuse of discretion in the admission of either the $100 bills or the list of the bills' serial numbers.[36]

## B. The Ice

Cabrera argues that the government failed to establish a chain of custody showing that the ice that he sold to the informant was the same as that introduced by the

government at trial. He contends that the ice therefore should not have been admitted into evidence.

 "A trial judge is correct in allowing physical evidence to be presented to the jury as long as a reasonable jury could decide that the evidence is what the offering party claims it to be."[37] Additionally,

> Courts require sufficient testimony to permit a reasonable inference that the object offered is what the proponent claims it to be, and the question whether the 'chain of custody' requirement has been satisfied depends upon 'the nature of the article, the circumstances surrounding its preservation and custody, and the likelihood of others tampering with it.'[38]

Generally, a break in the chain affects the weight of the evidence and not its admissibility.[39] As long as the proponent of the evidence establishes a threshold level of admissibility, the trial court's determination should be respected on appeal absent a clear abuse of discretion.[40]

 The record shows that there was a chain of custody linking the ice that Cabrera sold to the informant to the ice packets that were offered as evidence at trial. Agent Mangerero testified that he recovered two packets of ice from the informant after the buy-bust.[41] Mangerero transported the evidence to DPS headquarters, where he placed the two packets into a larger plastic container. He then delivered the container to Agent Salas for field testing. He and Salas tested the substance, which registered "presumptive positive" for amphetamines.[42] Salas also weighed the substance in the packets.[43]

After testing, the two packets were heat-sealed into the larger plastic container, upon which Mangerero

---

[34] Id. at 52-53.

[35] See Com. R. Evid. 901. This rule states, in relevant part:

(a) General Provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(b) Illustrations. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

(1) Testimony of witness with knowledge. Testimony that a matter is what it is claimed to be.

. . . .

(4) Distinctive characteristics and the like. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

Id.: see also United States v. Jardina, 747 F.2d 945, 951 (5th Cir. 1984) (when presented evidence of questionable origin, court should admit evidence if proponent makes prima facie showing of authenticity), cert. denied, 470 U.S. 1058, 105 S. Ct. 1723, 84 L. Ed. 2d 833 (1985).

[36] Sokau noted one minor discrepancy between the serial number on his list and the serial number on one of the $100 bills. We reject Cabrera's argument that this rendered all of the fifteen $100 bills inadmissable on authentication grounds.

---

[37] United States v. Casto, 889 F.2d 562, 568 (5th Cir. 1989) (citation omitted), cert. denied, 493 U.S. 1092, 110 S. Ct. 1164, 107 L. Ed. 2d 1067 (1990).

[38] Christopher B. Mueller & Laird C. Kirkpatrick, 5 FEDERAL EVIDENCE § 520 (2d ed. 1994) (footnotes omitted).

[39] Casto, 889 F.2d at 569.

[40] United States v. Godoy, 528 F.2d 281, 283 (9th Cir. 1975) (per curiam).

[41] Transcript of Proceedings, supra note 7, at 248.

[42] Id. at 253-55, 257.

[43] Id. at 343-45.

placed his initials.[44] He then gave the container to Sokau. Mangerero and Salas testified that the two "internal" packets were placed into one larger container. Sokau, however, testified that he received only one bag, which contained only one packet inside, from Mangerero.[45] Sokau stated that he then placed the container in a drawer of Lieutenant Concepcion's desk.[46] Concepcion stated that he received the larger plastic container a week later.[47] Concepcion subsequently placed the container in DPS's locked evidence room, and shortly thereafter released the container to Sokau for a period of about five weeks, until Sokau returned the evidence to him. Concepcion then released the evidence to Sokau for it to be transported to Guam for testing.[48]

In Guam, the substances in the two internal packets were combined for testing, determined to be ice, and returned to DPS in one packet via registered mail.[49] The ice was then kept in Sokau's locker, apart from a brief release to counsel for the government, until trial.[50]

Cabrera makes three arguments in support of his position that the ice did not meet the required threshold of admissibility. First, he asserts that because Sokau remembered the container as having only one internal packet, rather than two, the government was unable to authenticate the ice.

Mangerero and Salas were the agents who handled the ice after the buy-bust, and Salas heat-sealed the two packets into the larger, single container. Sokau was not the agent involved in this process. Sokau and Concepcion, in turn, testified that the container was not altered between the time it was delivered by Sokau to Concepcion and the time it was sent to Guam for testing. The witness who ultimately testified to receiving the container in Guam stated that two internal packets were present in the larger container, buttressing the position that the two smaller packets were inside the heat-sealed, larger container. Sokau's belief that only one internal bag of the substance was sent to the locker room, rather than two, is insufficient, in light of the other evidence, to

alter our conclusion that the threshold of admissibility was met for purposes of foundation.

Second, Cabrera contends the ice was inadmissible because it remained in Concepcion's desk for a week prior to being locked in the evidence room, and because it was placed in Sokau's locker, which was accessible to DPS personnel other than Sokau for a certain period before trial. We do not in any way condone such sloppy police practice, but in the absence of any showing that the substances were tampered with while in Concepcion's desk or Sokau's locker, we will not presume that tampering occurred.[51]

Third, Cabrera asserts that there was a difference in weight between the ice tested on Guam and the ice that Salas field tested. The government attributes the difference to the fact that Salas weighed the ice *and* the packaging, and the Guam crime lab weighed the ice without the packaging. The difference between the weight tested by the crime lab and by DPS was slightly less than .1 gram. This is just under .0035 ounces, which the government explains was the weight of the bags in which the ice was packaged.

The government's explanation is plausible. Again, without a showing of bad faith or proof that the substance was somehow altered while in the custody of the government, we find no abuse of discretion.[52] The discrepancy in the weight was not necessarily material, as a threshold matter, as to whether the evidence was admissible. We are not persuaded that the trial court abused its discretion in admitting the ice.

### III. Denial of Motion for Judgment of Acquittal

■ Cabrera claims that the trial court erred in denying his motion for a judgment of acquittal as to Count I, which charged him with delivery of ice.[53]

Cabrera confines his argument to two points: first, the trial court erred in admitting into evidence both the list of $100 bills' serial numbers (Exhibit 1), the $100 bills themselves (Exhibit 3), and the two packets of ice (Exhibit 8); second, absent this evidence, a reasonable

---

[44] *Id.* at 257.

[45] *Id.* at 404-05.

[46] *Id.* at 406-07.

[47] *Id.* at 387.

[48] *Id.* at 168-69, 388-91.

[49] *Id.* at 483, 491, 495.

[50] *Id.* at 175-81.

---

[51] *See Miller*, 994 F.2d at 443-44.

[52] *Id.* at 443.

[53] We review this issue de novo, and consider all of the evidence in the light most favorable to the government to determine whether any rational trier of fact could have found guilt beyond a reasonable doubt on the essential elements of the offense. *Ramangmau*, 4 N.M.I. at 237.

fact finder could not have found Cabrera guilty beyond a reasonable doubt of delivery of ice.

As discussed above, the court did not err in admitting the list, the bills or the ice. Therefore, Cabrera's challenge to the denial of his motion for a judgment of acquittal fails.

## IV. Jury Instruction on Burden of Proof for the Defense of Entrapment

Cabrera contends that the jury instruction given on entrapment misstated the law as to this defense. He asserts that it failed to include specific language on the government's burden of proof to show the accused's predisposition to commit the crime charged. Our review of the record shows otherwise.

Cabrera asserts that the trial court erroneously instructed the jury using the "subjective" test of entrapment, instead of the "objective" test followed by the majority of jurisdictions. The subjective test focuses on the criminal predisposition of the accused prior to government contact and reserves the issue of predisposition to the trier of fact. The objective test, used by a minority of jurisdictions, is designed to ensure proper police conduct, and the question of entrapment is usually decided by the court.[54] We adopt the subjective test, particularly the version followed by the federal courts. ▮▮▮ The defense of entrapment has two elements: "(1) government inducement of the crime, and (2) the absence of predisposition on the part of the defendant."[55] Once the defendant has shown evidence of inducement, the burden shifts to the government to prove that the defendant was "'predisposed to violate the law *before* the government intervened.'"[56] The court rules on the issue of entrapment if it can be decided as a matter of law; that is, where the facts are undisputed. Otherwise, the issue

of entrapment is reserved for the trier of fact (in this case, the jury) "as part of its function of determining guilt or innocence of the accused."[57]

▮▮▮ Cabrera claims that the trial court's instruction, which was based on the subjective test, did not clearly specify that the government had the burden of proving predisposition, and thus the court committed reversible error. The instruction given provides, in pertinent part: "In order to return a verdict of guilty . . . you must find beyond a reasonable doubt that the defendant had a previous intent or disposition or willingness to commit the crime charged."[58]

In our review of a jury instruction we must assess whether the jury instructions "as a whole" were misleading or inadequate to "guide the jury's deliberation."[59] Although the jury instruction could have been more specific, we cannot say that it was inadequate in view of all the instructions.

Immediately prior to giving the entrapment instruction, the trial court stated:

> The jury will remember that a defendant is never to be convicted on mere suspicion or conjecture. The burden is always upon the prosecution to prove guilt beyond a reasonable doubt. The burden never shifts to the defendant for the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.[60]

Prior to this, the court had told the jury not to "single out any particular sentence or any individual point of instruction and ignore the others,"[61] and to "[c]onsider the instructions as a whole and each in light of all the others."[62] These statements by the court, when read in

---

[54] *See Sherman v. United States*, 356 U.S. 369, 78 S. Ct. 819, 2 L. Ed. 2d 848 (1958) (majority adopting subjective test and Frankfurter, J., concurring, urging adoption of objective test).

[55] *United States v. Mkhsian*, 5 F.3d 1306, 1309 (9th Cir. 1993) (citation and internal quotation marks omitted).

[56] *Id.*, 5 F.3d at 1311 (quoting *Jacobson v. United States*, 503 U.S. ___, 112 S. Ct. 1535, 1541 n.2, 118 L. Ed. 2d 174, 184 n.2 (1992) (emphasis in original)).

[57] *Mkhsian*, 5 F.3d at 1309 (citations and internal quotation marks omitted).

[58] Transcript of Proceedings, *supra* note 7, at 710.

[59] *United States v. Varela*, 993 F.2d 686, 688 (9th Cir.) (citation and internal quotation marks omitted), *cert. denied*, ___ U.S. ___, 114 S. Ct. 232, 126 L. Ed. 2d 186 (1993).

[60] Transcript of Proceedings, *supra* note 7, at 709.

[61] *Id.* at 696.

[62] *Id.*

conjunction with the challenged entrapment instruction, adequately apprised the jury of the government's burden of showing predisposition.[63]

## V. Sentencing under 6 CMC § 2141(b)(1)

■ Cabrera argues that the trial court misinterpreted the applicable sentencing statute as mandating a prison term of at least five years without suspension, probation or parole. A trial court's interpretation of a statute is subject to de novo review.[64]

■ The provision in question provides:

> (b) Any person who violates subsection (a) of this section with respect to:
> (1) . . . methamphetamine[ ]hydrochloride may be sentenced to a term of imprisonment for not more than 10 years, a fine of not more than $10,000, or both; provided, however, the term of imprisonment shall not be less than five years and not subject to suspension, probation or parole . . . .[65]

Cabrera argues that subsection (b)(1) gives the trial court discretion to impose a sentence of imprisonment *or* a fine *or* both. The government asserts that the language of subsection (b)(1) prescribes a mandatory prison term of five years without suspension, probation, or parole. The government contends that the court may exercise its discretion only to impose a prison term greater than five years and/or a fine.

We agree with Cabrera's reading of the statute. We are not certain, however, that the trial court misinterpreted the statute in sentencing Cabrera.

■ After considering the parties' arguments about the statutory guidelines during sentencing, the court stated:

> I have searched for an alternative sentencing for you . . . and I just couldn't find one. I *believe that the statute calls for a mandatory sentence and* that the only alternative sentencing for you is to serve, *to sentence you to a term of imprisonment pursuant to the statute.*
>
> I understand that the argument for the purposes of sentencing as to whether or not it should be a purpose of punishing you, . . . that's what the legislature decide[d], I believe, is to punish people who violate the law with respect to selling, possession and distributing a dangerous substance called ice. And I believe the legislature, in passing the Substance Control Act, also decided that a term of imprisonment is for the purpose of deterring others from committing the same acts. And, . . . that when the legislature decided to pass the statute, they also thought about the purposes of sentencing as a rehabilitative tool. . . . And I think that all of this ha[s] been considered by the legislature *when they pass*[ed] *the statute calling for a minimum mandatory sentence.*
>
> . . . .
>
> I don't believe that a fine will do you any good. That money should be used to, at least, help your family through these times while you're incarcerated.[66]

The government then asked the court to order that the five-year sentence not be subject to suspension, probation, or parole. The court responded: "It will be that, that is as stated in the statute and I sentenced the defendant pursuant to the statute."[67] Counsel for Cabrera requested clarification, saying "[t]he court's view is that there is a mandatory minimum requirement, correct[?]"[68] The court answered "[t]hat's correct."[69]

---

[63] The instruction given is similar to others unsuccessfully challenged on the same grounds. *See, e.g., United States v. Moore*, 921 F.2d 207, 210 (9th Cir. 1990); *United States v. Abushi*, 682 F.2d 1289, 1301 n.7 (9th Cir. 1982); *see also United States v. Nixon*, 777 F.2d 958, 965-67 (5th Cir. 1985); *United States v. Rivera*, 778 F.2d 591, 601-02 (10th Cir. 1985), *cert. denied*, 475 U.S. 1068, 106 S. Ct. 1068, 89 L. Ed. 2d 609 (1986); *United States v. Sonntag*, 684 F.2d 781, 786-87 (11th Cir. 1982); *United States v. Johnson*, 605 F.2d 1025, 1026-27, 1029 (7th Cir. 1979), *cert. denied*, 444 U.S. 1033, 100 S. Ct. 706, 62 L. Ed. 2d 670 (1980).

[64] *Commonwealth v. Kaipat*, 2 N.M.I. 322, 327-28 (1991).

[65] 6 CMC § 2141(b)(1).

[66] Transcript of Proceedings, *supra* note 7, at 748-50 (emphasis added).

[67] *Id.* at 752.

[68] *Id.*

[69] *Id.*

Notwithstanding Cabrera's attorney's attempt to obtain a clear statement of the trial court's interpretation of the sentencing statute, we have difficulty determining precisely whether the court believed the statute required it to impose a mandatory minimum of five years of imprisonment, without suspension, probation, or parole. On one hand, the court's statements may be an expression of its belief that, once it decided to impose a prison sentence, the term of imprisonment had to be a minimum of five years without suspension, parole, or probation. The court did not, however, clearly state that the statute did not preclude it from imposing an alternative sentence consisting of, for example, only a fine. The court may have "searched for an alternative," decided that a fine would not do Cabrera "any good," and concluded that a sentence of eight years of imprisonment would be appropriate.[70] If this was the interpretation followed by the court, the sentence it formulated falls well within the statutory guidelines and there is no error.

On the other hand, however, the court appears to have interpreted the sentencing statute as Cabrera contends: i.e., that it was obligated to impose a prison term of five years without probation, suspension or parole, plus more prison time, or a fine, or both, to be added to the five-year prison term at the court's discretion. Because we are unable to determine from the record exactly how the trial court interpreted the statute in question, we have no recourse but to remand this issue for clarification and, if necessary, resentencing.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of conviction of delivery of methamphetamine hydrochloride entered against Cabrera. We **VACATE** the sentence imposed to give the trial court an opportunity to clarify its interpretation of the sentencing statute. If its interpretation is in line with our ruling herein, the sentence shall be reinstated. If not, Cabrera shall be resentenced.

---

ATALIG, Justice, dissenting:

The majority upholds the conviction of Francisco M. Cabrera ("Cabrera") for the delivery of .42 grams of methamphetamine hydrochloride ("ice") in part because it concludes that Cabrera's waiver of his *Miranda* rights was voluntary. It also concludes that the trial court did not abuse its discretion in admitting the ice into evidence. I disagree strongly with these conclusions.

I would hold that the court erred in denying Cabrera's motion to suppress the confession because the warnings he received and his waiver were invalid under *Miranda*.[71] Further, I would hold that the court abused its discretion in admitting the ice into evidence because the government failed to provide an adequate testimonial chain of custody. Accordingly, I would reverse the conviction.[72]

## ANALYSIS

Placed at issue by Cabrera is both the sufficiency of the *Miranda* rights warnings he received and whether his waiver of those rights was voluntarily, knowingly, and intelligently made. Also in contention is whether, under the Fifth Amendment to the U.S. Constitution, Cabrera's confession was voluntary. These are distinct issues which implicate different tests and respective factors, yet the majority fails to distinguish between them and summarily concludes that the totality of the circumstances evinces that Cabrera's waiver, as well as his confession, was voluntary.

Cabrera also argues that the trial court abused its discretion in admitting the ice into evidence because the government failed to establish an adequate testimonial chain of custody. The majority concludes that the admission was proper, despite ample evidence in the record showing not only that the government failed to meet its burden of showing an improbability that the evidence was either tampered with or altered but the *likelihood* of tampering or alteration as well. Furthermore, notwithstanding this evidence, the majority

---

[71] The disposition of a motion to suppress evidence is reviewed de novo. *See Commonwealth v. Ramangmau*, 4 N.M.I. 227, 235 (1995).

[72] In light of my conclusions on the *Miranda* issue and admissibility of the ice, I need not address the other issues raised by Cabrera, including that going to cumulative error. *See* analysis, *infra*. I will, however, address the testimonial chain of custody for Exhibit 13 because it bears upon the sufficiency of the foundation laid for the admission of Exhibit 8 into evidence. Exhibit 13 contains the packet allegedly retrieved from Cabrera by Agent Joaquin Salas ("Salas") at the Susupe police station. *See* majority opinion, *ante*; Transcript of Proceedings at 329-34, *Commonwealth v. Cabrera*, Crim. No. 92-0090 (N.M.I. Super. Ct. Mar. 17, 1993) (testimony of Salas).

---

[70] The fact that the trial court sentenced Cabrera to eight years imprisonment indicates that the court not only considered incarceration to be a proper sentence, but that such a sentence should be more than the minimum five-year period.

effectively shifts the burden from one on the government to establish an adequate testimonial chain of custody for the ice to one on Cabrera to rebut a presumption of propriety on the part of the police.

## I. *Miranda* Rights Warnings and Cabrera's Waiver of those Rights Invalid

The Fifth Amendment privilege against self-incrimination protects an individual from being compelled by the state to be a witness against him or herself. *See* U.S. Const. amend. V.[73] To determine the voluntariness of a confession under the Fifth Amendment, a court must inquire whether, considering the totality of the circumstances, *Arizona v. Fulminante*, 499 U.S. 279, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991), law enforcement officials have coerced the accused. *Commonwealth of the N. Mariana Islands v. Mendiola*, 976 F.2d 475, 484 (9th Cir. 1992), *rev'g* 1 N.M.I. 587 (1991).[74] This coercion may be either physical or psychological. *Id.*, 976 F.2d at 485.[75] Among the factors considered are interrogation tactics, any pressures on the person in custody, see *id.*, 976 F.2d at 485-86, and whether adequate *Miranda* warnings were given. *Id.*, 976 F.2d at 482-83, 486; *see also Withrow v. Williams*, 507 U.S. ___, 113 S. Ct. 1745, 1754, 123 L. Ed. 2d 407, 420 (1993).

While an accused's rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), are intended to protect his or her Fifth Amendment privilege against self-incrimination and a "'fundamental

---

[73] This privilege applies to the states through the Fourteenth Amendment, see generally *Withrow v. Williams*, 507 U.S. ___, ___, 113 S. Ct. 1745, 1754, 123 L. Ed. 2d 407, 420 (1993) (citing *Malloy v. Hogan*, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964)), and to the Commonwealth of the Northern Mariana Islands under the COVENANT TO ESTABLISH A COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS IN POLITICAL UNION WITH THE UNITED STATES OF AMERICA § 501, 48 U.S.C. § 1801 note, *reprinted in* CMC at B-106. Our local constitution also provides, as a fundamental right in all criminal prosecutions, this same privilege. *See* N.M.I. Const. art. I, § 4(c).

[74] The government must show, by a preponderance of the evidence, both that the confession was voluntary and that the waiver of an accused's *Miranda* rights was properly effected. *Colorado v. Connelly*, 479 U.S. 157, 167-69, 107 S. Ct. 515, 522-23, 93 L. Ed. 2d 473, 484-85 (1986).

[75] It is not, however, concerned with moral or psychological pressures to confess stemming from unofficial coercion. *Oregon v. Elstad*, 470 U.S. 298, 304-05, 105 S. Ct. 1285, 1290-91, 84 L. Ed. 2d 222, 229 (1985).

trial right'" against the use of unreliable statements, *Withrow*, 507 U.S. at ___,113 S. Ct. at 1753, 123 L. Ed. 2d at 419 (citations omitted), see also *Colorado v. Connelly*, 479 U.S. 157, 170, 107 S. Ct. 515, 523, 89 L. Ed. 2d 473, 486 (1986), purported abrogations of *Miranda* and Fifth Amendment rights must be distinctly examined.

First, the *Miranda* exclusionary rule is broader than that applied under the Fifth Amendment. *See* analysis, *infra*. The Fifth Amendment is only concerned with official coercion. *New York v. Quarles*, 467 U.S. 649, 655 n.5, 104 S. Ct. 2626, 2631 n.5, 81 L. Ed. 2d 550, 556 n.5 (1984);[76] *Oregon v. Elstad*, 470 U.S. 298, 304-05, 105 S. Ct. 1285, 1290-91, 84 L. Ed. 2d 222, 229 (1985). On the other hand, *Miranda* analysis requires an examination of the adequacy of both the warnings and the waiver; the latter must not only be voluntarily but knowingly and intelligently made as well. *See* analysis, *infra*.

Furthermore, the "coercion" which renders a confession involuntary under the Fifth Amendment may differ from the coercion which will invalidate a waiver of one's *Miranda* rights. *Withrow*, 507 U.S. at ___, 113 S. Ct. at 1752, 123 L. Ed. 2d at 418 (quoting *Miranda*, 384 U.S. at 457, 86 S. Ct. at 1618, 16 L. Ed 2d at 713); *cf. Moran v. Burbine*, 475 U.S. 412, 421-22, 106 S. Ct. 1135, 1141, 89 L. Ed. 2d 410, 421 (1986). For example, while a failure to give proper *Miranda* warnings creates a presumption of compulsion under *Miranda*, it is not, alone, a violation of the Fifth Amendment. *See Quarles, supra; Elstad, supra. Cf. Withrow*, 507 U.S. at ___, 113 S. Ct. at 1754, 123 L. Ed. 2d at 420; *Mendiola*, 976 F.2d at 482-83 (court examines invalidity of waiver as one factor under Fifth Amendment analysis). Conversely, a confession may be involuntary under the Fifth Amendment but permissible under *Miranda*.[77]

---

[76] "'Absent some officially *coerced* self accusation, the Fifth Amendment privilege is not violated by even the most damning admission.'" *New York v. Quarles*, 467 U.S. 649, 654, 104 S. Ct. 2626, 2630, 81 L. Ed. 2d 550, 555 (1984) (quoting *United States v. Washington*, 431 U.S. 181, 187, 97 S. Ct. 1814, 1818, 52 L. Ed. 2d 238, 245 (1977)).

[77] Whether or not *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), is implicated, a confession must be voluntary to be valid. Thus, a confession may be deemed coerced under the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment even after *Miranda* warnings are given and effectively waived. *See Connelly*, 479 U.S. at 167-69, 107 S. Ct. at 522-23, 93 L. Ed. 2d at 484-85 (coercive police activity necessary predicate to involuntariness under Fifth and Fourteenth Amendments).

However, the majority fails to discern and examine these distinctions in its analysis; rather, it cites to selectively chosen portions of factually and/or legally inapposite cases in support of its conclusions.[78] I agree with the majority that, in their totality, the circumstances indicate the voluntariness of the confession. Cabrera simply does not allege, under the totality of the circumstances, the official coerciveness proscribed by the Fifth Amendment.[79] However, I disagree with the majority in that I conclude that the warnings, and Cabrera's waiver of his *Miranda* rights, were invalid under *Miranda*.

## A. *Warnings and Waiver Insufficient under* Miranda

Under *Miranda*:

Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.

*Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612, 16 L. Ed. 2d at 706-07.

Thus, there must be both adequate warnings and a voluntary and cognizant waiver of the rights specified in the warnings. Otherwise, evidence procured without effective *Miranda* protection is inadmissible. *Id.*; *see also Elstad*, 470 U.S. at 307, 105 S. Ct. at 1292, 84 L. Ed. 2d at 231. While warnings need not duplicate the precise language used in *Miranda*, they must at least be as "effective . . . to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it." *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612, 16 L. Ed. 2d at 706. Like the voluntariness of a

confession under the Fifth Amendment, it is the government which bears the burden, by a preponderance of the evidence, see *supra* note 74, of showing, under the totality of the circumstances, *Moran*, 475 U.S. at 421, 106 S. Ct. at 1141, 89 L. Ed. 2d at 421, that an accused's waiver of his or her *Miranda* rights was voluntarily, knowingly and intelligently made.

The warnings given to Cabrera were the same warnings given to the defendant in *Mendiola*:

[Y]ou have a right to see at reasonable intervals, and for a reasonable time at the place of your detention, counsel, or members of you family, or your employer, or a representative of your employer. Do you understand? *I am required by law to make a reasonable effort to send a message* by telephone, cable, wireless, messenger or other faster means *to a lawyer or counsel, member of your family, your employer or your employer's representative if you so request, if such message can be sent without expense to the government or your* [sic] *pay in advance any expense there may be to the government. Do you understand?* You will be charged with a criminal offense or released within a reasonable time, which under no circumstances shall be more than 24 hours. Do you understand?

*Mendiola*, 976 F.2d at 482. As in *Mendiola*, these local warnings were then followed by the standard *Miranda* warnings. *See id. and* "Your Constitutional Rights" *in* Appellee's Supplemental Excerpts of Record at 1.

The *Mendiola* court deemed these same warnings, together, to be "equivocal, contradicting, and open to misinterpretation." 976 F.2d at 483. It equated them with those given the accused in *United States v. Connell*, 869 F.2d 1349, 1352 (9th Cir. 1989), which were deemed insufficient under *Miranda* analysis. *See Mendiola*, 976 F.2d at 483-84. In *Connell* the warnings given were misleading and ambiguous because, while the defendant was ultimately advised of his right to appointed counsel if he could not afford one, he was first told that he had the right to talk to an attorney only if an attorney could be obtained at no expense to the government. *Connell*, 869 F.2d at 1352. The *Connell* court held that such warnings did not adequately apprise a defendant of his right to appointed counsel and reversed the conviction under *Miranda*. *Id.*[80]

---

[78] I also note that in *Ramangmau*, the case upon which the majority relies for its description of the standards applicable to the determination of the propriety of a *Miranda* waiver, see majority opinion. *ante*, notes 26-29 and accompanying text, the issue of the validity of the warnings under *Miranda* was *not* before this Court. *See Ramangmau*, 4 N.M.I. at 235-36.

[79] I have considered Cabrera's unrebutted claim that Salas told him, prior to being read his rights by Agent Larry Sokau ("Sokau"), that he would be released if he cooperated; however, I am not convinced that, together with the invalid warnings and waiver, this rendered his confession coerced under the Fifth Amendment. *Cf., e.g., United States v. Tingle*, 658 F.2d 1332, 1336-37 (9th Cir. 1981).

---

[80] The *Mendiola* court noted that "it was not clear whether appointed counsel would be provided before questioning or at some future date." *Commonwealth of the N. Mariana Islands*

I agree with the *Mendiola* court and its equation of the *Connell* warnings with those given the defendant in *Mendiola*, the same warnings given Cabrera, and conclude that the warnings Cabrera received were ambiguous and misleading with respect to his right to counsel. *See* majority opinion, *ante* (acknowledging ambiguity of warnings under *Mendiola*). As such, he was inadequately apprised of this right under *Miranda*.

I am also disturbed by the use of the disjunctive term "or" in the warnings when one is apprised of *Miranda* rights. In other words, the person receiving the warnings has a choice of *either* seeing counsel, family members or an employer, but no more than one of these. Thus, that person would reasonably conclude that if he opted initially to see either a family member or employer, he no longer had "the continuous opportunity to exercise" his *Miranda* right to the presence of counsel. See analysis, *supra*.

The "[f]ailure to administer *Miranda* warnings creates a presumption of compulsion . . . [c]onsequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*." *Elstad*, 470 U.S. at 307, 105 S. Ct. at 1292, 84 L. Ed. 2d at 231.[81] This is because the "*Miranda* exclusionary rule . . . sweeps more broadly than the Fifth Amendment itself . . . [and] may be triggered even in the absence of a Fifth Amendment violation." *Id.* 470 U.S. at 306, 105 S. Ct. at 1291-92, 84 L. Ed. 2d at 230 (footnote omitted); *see also Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612, 16 L. Ed. 2d at 706-07.

Thus, because Cabrera was not given sufficient *Miranda* warnings, his waiver was involuntary under *Miranda*. *Cf. Connell*, 869 F.2d at 1350 n.1 (citing *Michigan v. Moseley*, 423 U.S. 96, 99-100, 96 S. Ct. 321, 324-25, 46 L. Ed. 2d 313, 319 (1975)). Furthermore, in light of the misleading and inadequate warnings, Cabrera could not have possessed the requisite "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Frank*, 956 F.2d 872, 877 (9th Cir. 1991) (quoting *Moran*, 475 U.S. at 421, 106 S. Ct. at 1141, 89 L. Ed. 2d at 421), *cert. denied*, 506 U.S. ___, 113 S. Ct. 363, 121 L. Ed. 2d 276 (1992).

The majority fails to note that the *Mendiola* court conducted Fifth Amendment analysis of the voluntariness of the defendant's confession, an analysis under which the insufficiency of the warnings was viewed as one of several indicia of the involuntariness of the confession. *See Mendiola*, 976 F.2d at 484-85. In *Mendiola*, the issue of the validity of the warnings specific to the sufficiency of the waiver under *Miranda* was never raised, either before this Court, see 1 N.M.I. at 593,[82] or the Ninth Circuit on appeal, see 976 F.2d at 481.[83] Because the Ninth Circuit determined that the totality of the circumstances required the confession's suppression under the Fifth Amendment, it was not required to decide whether the ambiguous warnings were, alone, *constitutionally* deficient. *See Mendiola*, 976 F.2d at 482-83.

Notwithstanding, the majority apparently reasons that the *Mendiola* court's implementation of Fifth Amendment analysis is wholly pertinent to the *Miranda* issues in this case. It then rephrases the issue to "whether the use of the [warnings] form alone rendered Cabrera's confession inadmissible." In other words, it acknowledges that the warnings were faulty, but looks to see if this alone warrants suppression of the confession,

---

*v. Mendiola*, 976 F.2d 475, 483 (9th Cir. 1992), *rev'g* 1 N.M.I. 587 (1991). "We reject as fatally flawed . . . a version of the *Miranda* litany if the combination or wording of its warnings is in some way affirmatively misleading, making such an inference [of appointed counsel before and during questioning] less readily available." *Id.*, 976 F.2d at 482 (quoting *United States v. Connell*, 869 F.2d 1349, 1352 (9th Cir. 1989)). This is in contrast to *Miranda* rights which are not rendered ambiguous, for example, by warnings that adequately apprise a defendant of the state procedure for the *appointment* of counsel and do not falsely suggest that an indigent has no right to counsel before and during questioning, see *Duckworth v. Eagan*, 492 U.S. 195, 203-04, 109 S. Ct. 2875, 2880-81, 106 L. Ed. 2d 166, 177-78 (1989), or the failure to explicitly inform a defendant of his or her right to appointed counsel. See *United States v. Noa*, 443 F.2d 144 (9th Cir. 1971) (warnings denoting right to have attorney present, and from which one could infer right to appointed counsel, sufficient under *Miranda*), expounded upon in *Connell*, 869 F.2d at 1352, and distinguished in *Mendiola*, 976 F.2d at 482.

[81] This compulsion goes not to actual coercion but rather to an abrogation of the privilege against self incrimination. *See Elstad*, 470 U.S. at 310, 105 S. Ct. at 1293, 84 L. Ed. 2d at 233 (citing *Quarles*, 467 U.S. at 654, 104 S. Ct. at 2630, 81 L. Ed. 2d at 555-56; *Miranda*, 384 U.S. at 457, 86 S. Ct. at 1618, 16 L. Ed. 2d at 713-14.

---

[82] In this Court's *Mendiola* opinion, it was noted that the validity of the defendant's *Miranda* waiver was not at issue and, hence, would not be addressed on appeal. *See Commonwealth v. Mendiola*, 1 N.M.I. 587, 593 (1990) (citing *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 1141, 89 L. Ed. 2d 410 (1986)).

[83] The issue raised before that court was whether the warnings were "affirmatively misleading and confusing *in violation of the Fifth Amendment*." *Mendiola*, 976 F.2d at 481 (emphasis added).

despite the *Miranda* requisite of adequate warnings. See analysis, *supra*.

Then, to resolve this issue, the majority abandons the precedent in *Mendiola* and *Connell* and relies exclusively upon *Duckworth v. Eagan*, 492 U.S. 195, 109 S. Ct. 2875, 106 L. Ed. 2d 166 (1989). However, in *Duckworth* the issue before the Court was not whether faulty warnings alone warranted suppression under *Miranda* but whether the warnings were insufficient under *Miranda* analysis. The former issue was never reached by the Court because the warnings were deemed sufficient. In short, the Court's holding in *Duckworth* lends no support whatsoever to that of the majority. *Cf.* Kirsten M. Eriksson, *Custodial Interrogations*, Project, *Twenty-Third Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1992-1993*, 82 GEO. L.J. 733, at 734-35 n.548 (1994), *cited in* majority opinion, *ante*, note 12 (distinguishing *Duckworth* from *Mendiola* in discussion regarding sufficiency of warnings under *Miranda*).

Furthermore, the majority's understanding of and reliance upon *Duckworth* is erroneous. It likens the warnings in *Duckworth* to those Cabrera received "because one portion was questionable." The similarities end there. In *Duckworth*, the Court determined that otherwise unambiguous warnings were not rendered ambiguous by the correct delineation of the state procedure for the appointment of counsel. See *supra* note 80. It concluded that apprising the accused of when he could obtain appointed counsel under that procedure did not impede his understanding of his rights to counsel being present during questioning and to remain silent. *Duckworth*, 492 U.S. at 203-04,109 S. Ct. at 2880-81, 106 L. Ed. 2d at 177-78. Here, the warnings were so ambiguous that they call into question Cabrera's right to counsel prior to and during questioning at all.

Ultimately, the majority examines the totality of the circumstances to determine the validity of the waiver and the voluntariness of the confession, and declares that "applying a totality of the circumstances analysis, Cabrera voluntarily waived his rights and confessed." Majority opinion, *ante*. In effect, the majority bases its conclusion that the waiver was valid on its conclusion that, under the Fifth Amendment, the confession was voluntary under the totality of the circumstances.

### B. Inadequate Warnings and Waiver not Harmless Error

The harmless error doctrine applies to both *Miranda*, *United States v. Beale*, 921 F.2d 1412, 1435 (11th Cir.), *cert. denied*, 502 U.S. ___, 112 S. Ct. 100, 116 L. Ed.

2d 71 (1991), and Fifth Amendment violations, *Fulminante*, 499 U.S. at 295-96, 111 S. Ct. at 1257, 113 L. Ed. 2d at 322 (Rehnquist, C.J., delivering part II of Court's opinion) (*cited in Desire v. Attorney General of California*, 969 F.2d 802, 805 (9th Cir. 1992)). The government argues that, because a defendant may be cross-examined and impeached, under some circumstances, using a statement violative of *Miranda*, any error was harmless, given Cabrera's subsequent testimony at trial. I disagree.

To determine if a *Miranda* error is harmless, we look at "(1) the effect of the erroneously admitted statement upon the other evidence introduced at trial, and (2) [the effect] upon the conduct of the defense." *Beale*, 921 F.2d at 1435 (citations omitted). We then look to see if "whether, absent the illegal statement, the remaining evidence is not only sufficient to support the conviction, but so overwhelming as to establish . . . guilt beyond a reasonable doubt." *Id.* (citation omitted).[84] Because of the "profound impact . . . [a] confession has upon the jury, [we must] exercise extreme caution before determining that the [erroneous] admission . . . was harmless." *Fulminante*, 499 U.S. at 296, 111 S. Ct. at 1258, 113 L. Ed. 2d at 322-23; *cf. Desire*, 969 F.2d at 805.

Here, it is very likely that the admission influenced the conduct of the defense. Had the confession been suppressed under *Miranda*, Cabrera might have exercised his Fifth Amendment right to not take the stand. See *Harris v. New York*, 401 U.S. 222, 225, 91 S. Ct. 643, 645, 28 L. Ed. 2d 1, 4 (1971).[85] Indeed, Cabrera testified only *after* the confession was admitted into evidence. Also, his confession bore directly upon the other evidence introduced at trial; a confession without which the remaining evidence was not overwhelming to establish guilt.

### II. Court Abused its Discretion in Admitting Packets of Ice into Evidence

---

[84] *Cf. Desire v. Attorney General of California*, 969 F.2d 802, 805 (9th Cir. 1992) (Fifth Amendment error harmless only where the state "'has proved beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained'") (citations omitted).

[85] Once a defendant waives this right, however, he or she cannot refuse to answer questions during cross-examination that are reasonably related to matters within the scope of direct testimony. See *United States v. Black*, 767 F.2d 1334, 1341 (9th Cir.), *cert. denied sub nom.*, *Black v. Harris*, 474 U.S. 1022, 106 S. Ct. 574, 88 L. Ed. 2d 557 (1985).

Cabrera's argument that the packets of ice were improperly admitted into evidence calls into question the chain of custody, for which the government must be able to show sufficient evidence that an item is what it claims to be. *See* Com. R. Evid. 104(b), 901(a); *see also United States v. Abreu*, 952 F.2d 1458, 1467 (1st Cir.), *cert. denied*, ___ U.S. ___, 112 S. Ct. 1695, 118 L. Ed. 2d 406 (1992); *United States v. Harrington*, 923 F.2d 1371, 1374 (9th Cir.) (citing Fed. R. Evid. 901(a)), *cert. denied*, 502 U.S. ___, 112 S. Ct. 164, 116 L. Ed. 2d 128 (1991).[86]

To show that the ice sought to be introduced at trial was obtained from Cabrera, the government had to show that it was connected to him. *See United States v. Black*, 767 F.2d 1334, 1342 (9th Cir.), *cert. denied sub nom.*, *Black v. Harris*, 474 U.S. 1022, 106 S. Ct. 574, 88 L. Ed. 2d 557 (1985). To demonstrate this connection, the government must establish a chain of custody. *Harrington*, 923 F.2d at 1374. Proof of connection may be made by either direct or circumstantial evidence. *Black*, 767 F.2d at 1342.

The requisite level of proof will depend upon the character of an item. If it is "readily identifiable by a unique feature or other identifying mark" it is properly admitted. *Abreu*, 952 F.2d at 1467; *United States v. Clonts*, 966 F.2d 1366, 1368 (10th Cir. 1992) ("foundation for admission need only be testimony that the evidence is what it purports to be"). However, if the item is susceptible to "alteration or tampering, or is not readily identifiable, . . . a more elaborate chain of custody" is required. *Clonts*, 966 F.2d at 1368; *see also Abreu*, 952 F.2d at 1467. The purpose of this tracing of the chain of custody "is to render it improbable that the original item either has been exchanged with another or

has been tampered with or contaminated." *Abreu*, *supra*.

Because ice is a fungible material subject to change, a testimonial chain must have been established by the government showing sufficient evidence that the substances in the packets were neither tampered with nor exchanged and were the same items retrieved from Cabrera. *Cf. id.*, 952 F.2d at 1471-72 (requiring sufficient testimonial chain for cocaine); *Clonts*, 966 F.2d at 1368 (marijuana "not unique or resistant to alteration, [hence,] a sufficient chain of custody is required"). This was not done.

First, the testimony was inconsistent with respect to the condition of the packets in which the ice was kept; these ambiguities render the exhibits suspect. Foremost is the discrepancy between the condition of the packets as testified by Agent Joaquin Salas ("Salas"), and Felisa M. Pineda ("Pineda"), the analyst at the Guam Crime Laboratory ("Guam"). Salas, according to the government's testimonial chain, was the person who, on May 20, 1992, field tested the substance in the packets and then heat sealed the packets and evidence bag in which they were placed. *See, e.g.*, Transcript of Proceedings at 337-38, 341-42, 346-47, *Commonwealth v. Cabrera*, Crim. No. 92-0090 (N.M.I. Super. Ct. transcribed Sept. 14, 1993) (testimony of Salas).

There is no testimony in the record showing the occasion or necessity of opening either the evidence bag or the packets containing the ice prior to their receipt at Guam. However, Pineda testified that upon her receipt of the exhibits for testing, one of the packets inside Exhibit 8 was heat sealed but the other was "opened and taped"; also, Exhibit 13 contained one "open taped plastic packet." *Id.* at 471-72.[87] No attempt was made by the government to either rebut or clarify her testimony. *Cf. United States v. Godoy*, 528 F.2d 281, 284 (9th Cir. 1975) (per curiam) (ambiguous custodial form entry that seal broken on arrival at chemist's contradicted by other government evidence showing seal not broken) (*cited in* majority opinion, *ante*, note 40).

Thus, we are left with a testimonial chain evincing that at least two of the packets of ice received by Pineda were opened at some point between the time Salas heat

---

[86] The government must:

> [I]ntroduce sufficient proof so that a reasonable juror could find that the items . . . are in 'substantially the same condition' as when they were seized . . . [t]he . . . court may admit the evidence if there is a reasonable probability the article has not been changed in important respects . . . . [I]*n the absence of any evidence of tampering*, a presumption exists that public officers 'properly discharge[] their official duties.'

*United States v. Harrington*, 923 F.2d 1371, 1374 (9th Cir.) (citations omitted; emphasis added), *cert. denied*, 502 U.S. ___, 112 S. Ct. 164, 116 L. Ed. 2d 128 (1991). However, "[m]erely raising the *possibility* of tampering is not sufficient to render evidence inadmissible . . . [and] the *possibility* of a break in the chain of custody goes only to the weight of the evidence." *Id.* (citations omitted; emphasis added).

---

[87] Felisa M. Pineda ("Pineda") testified that on August 24, 1992, Exhibit 8 consisted of "one heat sealed plastic bag bearing white label and containing *one, ah, taped plastic packet and one heat sealed plastic packet* each containing crystalline substance." Transcript of Proceedings, *supra* note 72, at 471 (emphasis added). Pineda also stated that Exhibit 13 consisted of "one heat sealed plastic bag bearing white label containing, ah, one folded, stapled and taped yellow cardboard containing one *open* taped plastic packet containing crystalline substance." *Id.* at 472 (emphasis added).

sealed them and Pineda received them for testing, with no explanation as to why or when they were opened. The majority ignores this discrepancy in the government's testimonial chain of custody.

Second, the differences in the weights of the substances between those determined by Salas and Pineda were not explained. Salas testified that the weights of Exhibits 8 and 13 were, respectively, .42 and .24 grams. Pineda stated that the gross weights for the ice[88] in Exhibit 8 and 13 were, respectively, .3388 and .20722 grams. Thus, there were differences of .0812 and .03278 grams between the recorded weights of, respectively, Exhibits 8 and 13 as measured by Salas and Pineda.

While the majority accepts the government's explanation (that these differences may be explained away by the weight of the plastic in which Salas purportedly weighed the exhibits) as "plausible," the explanation is unsupported by the record. There was no testimony explaining this weight difference. Also, Salas's testimony was ambiguous as to whether he weighed the packets and substances together or the substances alone. See and compare Transcript of Proceedings, supra, at 343-45, 367 (weighed plastic) with id. at 345 (weighed substance).

Furthermore, unlike the weight differences in Godoy, these differences were not slight. In Godoy, "the difference between the weights reported by the . . . agents and the . . . chemist . . . was less than one-third of one percent of the gross weight." Godoy, 528 F.2d at 283. The court concluded that "[t]his small discrepancy does not affect admissibility." Id. Here, the differences in the weights of Exhibits 8 and 13, as measured by Salas and Pineda, were, respectively, 23.97 and 15.82% of the gross weight of the ice recorded by Pineda. These differences were, respectively, more than seventy-two and forty-seven times that of the percentage difference in Godoy.[89]

The majority emphasizes that the difference in weights for Exhibit 8 "is slightly less than .1 gram [or] . . . just under .0035 ounces," and deems this weight difference "not necessarily material" to the issue of

admissibility. Majority opinion, ante. This is a facile dismissal of an unexplained discrepancy in the weights of the substances as measured by Salas and Pineda.

Under NMI law, the weight of a substance reputed to be ice is not directly correlated to the degree of its materiality. Any recorded weight is material under 6 CMC § 2141. That section does not set a minimum weight for which one may be charged with the crime of trafficking a controlled substance. Furthermore, the government deemed .42 grams, or approximately .0148 ounces, to be "material" enough to charge Cabrera with trafficking under 6 CMC § 2141. The trial court deemed it "material" with respect to sentencing, meting eight out of the maximum ten years in sentencing to Cabrera, three years more than the five it presumed was the minimum. Yet, the majority reasons that nearly one-quarter of that same amount was immaterial to the issue of admissibility.

Third, there are inconsistencies with respect to the number of packets in which the ice was kept and the types and contents of the evidence bags along the testimonial chain. For example, with respect to Exhibit 8, Agent Manuel Mangarero ("Mangarero"), the agent who allegedly retrieved Exhibit 8 from Frank Camacho, testified that it consisted of two clear packets, each containing a crystalline substance, placed in one clear plastic bag and heat sealed by Salas. See Transcript of Proceedings, supra, at 248-49, 252-53, 255, 257. Salas also testified that he received Exhibit 8 from Mangarero for testing and that it consisted of a plastic bag with two clear packets inside, id. at 344-45, 360-61. Salas, after testing the exhibits, turned Exhibit 8 over to Agent Larry Sokau ("Sokau") on May 20th, and kept Exhibit 13 in his wall locker until May 27, 1992, when he turned it over to the evidence custodian, Officer Maximo Concepcion ("Concepcion"). Id. at 346-50.

Sokau, however, stated that when he received Exhibit 8 from Salas it consisted of one plastic bag labeled with the initials "MM," inside of which was only one small heat sealed packet. Id. at 404-05. This was corroborated by Concepcion, who stated that Exhibit 8 consisted of one plastic bag containing one packet. Id. at 383-84. The government does not explain these testimonial ambiguities[90] and the majority dismisses them and

[88] Pineda testified that she used .0124 and .0246 grams in the testing process for Exhibits 8 and 13, respectively, after the initial weighing. Transcript of Proceedings, supra note 72, at 488-89.

[89] The weight differences represent, for Exhibits 8 and 13, respectively 19.33 and 13.66% of the weight as recorded by Salas. These are, respectively, more than fifty-eight and forty-one times the weight difference in United States v. Godoy, 528 F.2d 281 (9th Cir. 1975) (per curiam).

[90] Additionally, Salas testified that he took Exhibit 13, consisting of six "foils" in one yellow cardboard packet, from Cabrera's sock. However, in court Salas was unable to initially identify the yellow cardboard because a brand name, "Hamlet," was missing from the cardboard. Transcript of Proceedings, supra note 72, at 332-34. Also, Sokau testified that when he received Exhibit 13 back from Officer Maximo Concepcion ("Concepcion") on May 29, 1992, "Exhibit 13 was with the

their effect on the adequacy of the testimonial chain of custody because, first, it was Salas and not Sokau or Concepcion who heat sealed the two packets in the larger bag, which he also heat sealed. This does not explain away the ambiguities in the officers' testimony.

The majority also states that because Sokau and Concepcion did not testify that the evidence bags appeared to have been altered between Concepcion's receipt of the exhibits from Sokau[91] and August 21, 1992, when they were sent to Guam, and because Pineda testified that Exhibit 8 contained two packets, the testimonial chain of custody remained inviolate. However, Concepcion did testify that the outer plastic bag in Exhibit 8, was, in court, different from the one he initially received on May 27 from Sokau, and that he was not aware of why or when the change in bags occurred. Transcript of Proceedings, *supra*, at 393-94.[92] The majority ignores the fact that there were two "transfers" of the evidence by Sokau to Concepcion prior to their having been returned to Sokau to be sent to Guam on August 21: one when Sokau deposited the evidence in Concepcion's desk drawer and the other on July 7, 1992. See *supra* note 91.

Additionally, even if there were no testimonial ambiguities evincing that the exhibits had been altered between the transfers between Sokau and Concepcion, it does not explain the problems with the *number* of packets in Exhibit 8. Finally, the bag was *not* received by Pineda on Guam. Rather, she received it from one Ray Hermillosa ("Hermillosa"), see Transcript of Proceedings, *supra*, at 472 (testimony of Pineda), who did not testify. There was no testimonial tracing of the chain of

---

socks . . . in an evidence bag." *Id.* at 183-84. Concepcion's testimony regarding the contents of Exhibit 13, upon his receipt thereof from Sokau on July 7, 1992, evinces that the sock(s) were no longer in the evidence bag. *See id.* at 390-97. There is no explanation as to the disappearance of either the "foils" or the sock(s).

[91] Concepcion twice received evidence from Sokau. The first time was on May 27, 1992, after Sokau left Exhibit 8 in his desk drawer. *See* analysis, *infra*. Concepcion then turned over all the exhibits to Sokau on May 29, when Sokau "requested to see the evidence." Transcript of Proceedings, *supra* note 72, at 388 (testimony of Concepcion). The second time Concepcion received evidence from Sokau was on July 7, when Sokau returned all the exhibits to him. *Id.* at 390.

[92] Also, Salas testified that he had to presume that the plastic packet inside Exhibit 13 in court was the same one he retrieved from Cabrera's sock because he did not mark the packet in any way. Transcript of Proceedings, *supra* note 72, at 360-61.

custody between the arrival of the exhibits on Guam and Pineda's receipt of the exhibits from Hermillosa, nor was there testimony regarding the condition of the exhibits along this chain. *See infra* note 94.

Fourth, there are gaps in the chain of custody for which no testimony was proffered. Unlike the cases cited by the majority, the "gaps" in this matter did not arise because of the failure of any one custodian to testify. *See, e.g., United States v. Miller*, 994 F.2d 441, 443-44 (8th Cir. 1993) (seizing officer did not testify) (*cited in* majority opinion, *ante*, at notes 32, 51 and 52); *United States v. Casto*, 889 F.2d 562, 568-69 (5th Cir. 1989) (*cited in* majority opinion, *ante*, at notes 37, 39) (technician who placed packages in vault upon arrival at laboratory did not testify), *cert. denied*, 493 U.S. 1092, 110 S. Ct. 1164, 107 L. Ed. 2d 1067 (1990). Here, there were periods during which the security and location of the ice when held by the police was questionable.

For example, Sokau testified that he gave the packets to Concepcion by placing them in Concepcion's unlocked desk drawer on May 20. Transcript of Proceedings, *supra*, at 406-08. Concepcion testified that he "received" Exhibits 8 and 13 from Sokau and Salas, respectively. *Id.* at 388-89. However, there was no physical receipt of the fungible item in Exhibit 8 by Concepcion from Sokau himself, and there was a period during which it was feasible that either the packets were not in Concepcion's unlocked drawer in the evidence office or they were left unattended. This is compounded by the testimonial ambiguities with respect to the persons who had access to that office.[93]

The majority reasons that because no "showing [was made] that the substances were tampered with while in Concepcion's desk or in Sokau's locker, [it] will not presume that tampering occurred," and the admissibility of the ice was not placed into question. Majority opinion, *ante*. According to the government's testimonial chain, however, one of the two packets in Exhibit 8 and the one packet in Exhibit 13 had been opened and taped between the time it was heat sealed by Salas and received by Pineda on Guam. See *supra* note 87 and accompanying text. This, together with the weight and testimonial

---

[93] Concepcion testified that only four persons had access to the evidence office: himself, Sokau, Frank Kapileo ("Kapileo") and Tarsicio Olopai ("Olopai"). Transcript of Proceedings, *supra* note 72, at 397-400. Sokau testified that, at the time, five persons had access to his office: himself, Concepcion, Kapileo, Olopai and John Santos. *Id.* at 406-08. However, Salas testified that he conducted the field tests in the evidence office, accompanied by Agents Manuel Mangarero and Dwain Fernandez, *id.* at 340-42, none of whom purportedly had access to the room.

discrepancies, raises more than a mere possibility of tampering and any period during which the packets were left unattended in an unsecured area is suspect. Yet, the majority effectively improperly shifts the burden to establish a testimonial chain of custody for a fungible item from the government to one on Cabrera to rebut a presumption of propriety on the part of the police, despite evidence of tampering or alteration. *See* majority opinion, *ante*, note 51 (citing *Miller*, 994 F.2d at 443-44) and accompanying text *and compare with* sources cited *supra* and *Miller*, 994 F.2d at 443-44 (presumption of propriety intact where government testimony reasonably shows exhibit unchanged during chain of custody *and* no evidence of alteration or tampering).

Furthermore, there are additional gaps in the chain of custody between Sokau to Pineda which were not sufficiently explained. For example, the chain of custody between Sokau and Hermillosa was unexplained. See analysis, *supra*.[94] While each of these gaps along the chain may not, alone, render the ice inadmissible, compare *Harrington*, *supra*, together they evince an insufficient testimonial chain.

Fifth, I am perplexed by the unexplained transfers of the packets between officers at the Department of Public Safety. While the majority may dismiss these as merely evidence of "sloppy police practice," majority opinion, *ante*, they are relevant to the issue of the security of the exhibits while held by the police. For example, it is unclear from the testimony why, if the field tests were conducted in the evidence office, and Concepcion was the evidence custodian, the packets, once tested in that room and sealed by Salas, were not all left there or deposited in the evidence room, to which Concepcion testified that he alone had access. See Transcript of Proceedings, *supra*, at 397-400. Also, subsequent to Concepcion's receipt of the packets on May 27, there was a period of approximately five weeks during which Concepcion did not have custody of the packets and for which no reason for a transfer to Sokau was given. See *supra* note 91.[95]

Finally, both the testimony and information evince problems with the identification of, and confusion between, the packets with respect to the crimes with which Cabrera was charged. This confusion was evidenced in the testimony of the police officers and agents in court. See, e.g., Transcript of Proceedings, *supra*, at 339-40, 344-45 (testimony of Salas identifying first Exhibit 13 then Exhibit 8 as consisting of two packets); *supra* note 92.

The information indicates this same confusion and goes to the government's failure to sufficiently establish proper chains of custody for each of the packets with respect to each count with which Cabrera was charged. Under the information, Cabrera was charged with the delivery of .42 grams of a controlled substance, pursuant to 6 CMC § 2141(a)(1), and the possession, with intent to deliver, of a total of .41 (.24 plus .17) grams of a counterfeit controlled substance, under 6 CMC § 2141(a)(2). See Amended Information, *Cabrera*, *supra*.[96] It is not clear from the record to which packet(s) these counts were applicable.

For example, it could be argued that presumably Count I reflected the packet(s) found on Cabrera by Mangarero, because Exhibit 8 weighed in at .42 grams as measured by Salas. However, the combined total of the weights in Count II, of .41 grams, was close to that in Count I, of .42 grams. Also, Exhibit 12, a packet allegedly taken from Cabrera at the scene and weighing approximately .17 grams, see Transcript of Proceedings, *supra*, at 345, 363 (testimony of Salas), was not entered into evidence. Yet, the instructions to the jury evince that the weights for the substances in Count II remained at .17 and .24 grams. See Jury Instructions, *Cabrera*, *supra*.

Hence, the instructions reflect two separate counts for the delivery of approximately .42 and .41 grams of ice. Yet, only .42 and .24 grams were entered into evidence. Because Mangarero testified that he took two packets from Camacho, and because we do not have the weight for any one single packet in Exhibit 8, *either* Count I or II could reflect Exhibit 8.

Based on the foregoing, the record evokes more than a mere "possibility" that the packets could have been

---

[94] Additionally, Sokau testified that he dropped the package containing the exhibits off at the DHL office on Friday, August 21, 1992. Transcript of Proceedings, *supra* note 72, at 169-74. He also testified that he received the exhibits back from Guam from Kapileo on October 21, 1992. *Id.* at 175. Neither Kapileo nor DHL personnel testified in court.

[95] Understandably, once Concepcion received the packets for safekeeping in the evidence room they would need to be transferred to, for example, Guam for testing and to counsel for the Department of Public Safety. However, while Sokau testified that the purpose for the transfer was to deliver the exhibits to the Guam Crime Laboratory, Transcript of Proceed-

ings, *supra* note 72, at 187-88, he proffered no explanation as to why they were not taken when he went to Guam the next day or why they then remained in his locker for approximately five weeks before he returned them to Concepcion in July.

[96] While the information was not again amended, the court appears to have summarily, without explanation, changed the instructions with respect to Count II from a charge under 6 CMC § 2141(a)(2) to one under 6 CMC § 2141(a)(1).

exchanged or altered. *Cf. Harrington, supra.* Indeed, it is more probable than not that the substances in the packets in Exhibit 8 "either ha[ve] been exchanged with another or ha[ve] been tampered with or contaminated." See analysis, *supra.* This calls into question whether there was sufficient proof of connection between the packets introduced at trial and Cabrera. Thus, I conclude that the admission of the packets into evidence was an abuse of the trial court's discretion. I also conclude that this error affected a substantial right of Cabrera and was not harmless.

Because I conclude that the erroneous admission of the confession and ice into evidence warrant reversal of the conviction, compare *Connell*, 869 F.2d at 1353 (reversal of conviction for lack of adequate *Miranda* warnings), I need not reach the issue of whether the errors committed by the court were cumulative. *See Commonwealth v. Saimon*, 3 N.M.I. 365, 398-99 (1992) (errors cumulative if defendant denied right to fair trial) (citing *United States v. McLain*, 823 F.2d 1457 (11th Cir. 1987).[97]

## CONCLUSION

Based on the foregoing, I would reverse the conviction of the defendant/appellant Francisco M. Cabrera.

---

[97] I do not doubt, however, that, together, these errors served to deny Cabrera his right to a fair trial.